# RABIA ALI ET AL. *v.* COMMUNITY HEALTH CARE PLAN, INC.
## (SC 16636)

Sullivan, C. J., and Borden, Norcott, Palmer and Vertefeuille, Js.

Argued April 18—officially released July 30, 2002

*David N. Rosen*, for the appellant (named plaintiff).

*Patrick M. Noonan*, with whom, on the brief, was *Tracey M. Lane*, for the appellee (defendant).

*Opinion*

NORCOTT, J. The sole issue in this appeal[1] is whether the trial court, in its charge to the jury, applied the correct standard of care. More specifically, we are required to determine whether the trial court's instruction to the jury that the standard of care to be applied in the case was that of a reasonably prudent nurse-midwife engaged in the practice of obstetrics and gynecology was proper. We conclude that the trial court charged the jury with the correct standard of care and, therefore, we affirm the judgment of the trial court.

The plaintiff, Rabia Ali,[2] brought this medical malpractice action against the defendant, Community Health Care Plan, Inc., a health maintenance organization,[3] alleging, inter alia, that the defendant was negli-

---

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court. The plaintiff, thereafter, filed a motion for transfer of the appeal to this court. We granted that motion pursuant to Practice Book § 65-2, and the transfer authority conferred upon us by General Statutes § 51-199 (c).

[2] In the substitute complaint the plaintiffs were Rabia Ali and her husband, Lawrence Lifschultz. Two of the four counts asserted in the substitute complaint were on behalf of Lifschultz. These counts were struck from the substitute complaint prior to trial. Hereinafter, all references to the plaintiff in this opinion are to Ali.

[3] The defendant, which is now defunct, was a health maintenance organization located in New Haven.

gent in its care and treatment of the plaintiff during her pregnancy. Specifically, the plaintiff alleged that the failure of the defendant's employee to advise her to report to a physician for medical treatment following the plaintiff's communication to the defendant's employee that she had experienced a vaginal discharge approximately two weeks after undergoing amniocentesis, forced her to terminate her pregnancy by inducing labor prematurely, which resulted in the death of her preterm baby. This action was tried to a jury, which returned a verdict for the defendant. The trial court denied the plaintiff's motion to set aside the verdict and for a new trial, and in accordance with the jury's verdict, rendered judgment in favor of the defendant. This appeal followed.

The jury reasonably could have found the following facts. In 1992, the plaintiff, who was then thirty-seven years old, became pregnant for the first time. At that time, the plaintiff received her prenatal care from the defendant's staff of medical personnel. During a routine medical visit, a nurse-midwife informed the plaintiff and her husband that, because of the plaintiff's age, genetic counseling and testing were available and were recommended. The testing was intended to reveal whether any abnormalities were present in the fetus. After being informed of the risks associated with the procedure, the plaintiff elected to undergo amniocentesis at Yale-New Haven Hospital on April 16, 1992. The amniocentesis revealed that the plaintiff's fetus was a healthy male.

On May 4, 1992, in preparation for a visit from a college friend, the plaintiff performed chores around the house. She vacuumed, prepared the futon bed in the living room and pulled out a heavy partition door so that her friend would have some privacy during her stay. That night she was very tired and her back ached. During the mid-morning hours the next day, the plaintiff

began to experience a discharge of fluid from her vagina. The plaintiff called her doctor's office to report the discharge. She spoke to a receptionist who informed the plaintiff that a health care provider would return her call. Shortly thereafter, Carol Brekus-Watson, a certified nurse-midwife employed by the defendant, called the plaintiff.

The plaintiff and Brekus-Watson spoke on the phone for approximately five to seven minutes. The plaintiff told Brekus-Watson that she was having a profuse discharge of fluid from her vagina. Brekus-Watson asked the plaintiff to describe the consistency of the fluid and the plaintiff reported that the discharge was "milky" in color and consistency, and not "watery." The plaintiff also reported that the discharge was odorless. Because the plaintiff's description of the discharge was inconsistent with a release of amniotic fluid, which is a potentially serious complication that can arise during a pregnancy, Brekus-Watson told the plaintiff that she did not need to come in for an examination, but that she should rest. Brekus-Watson also advised the plaintiff that she should call the office again if further concerns arose regarding the discharge. Brekus-Watson recorded the contents of the conversation in a note in the plaintiff's medical record. She wrote: "Patient with complaint of milky white, copious vaginal discharge. No bleeding. No pain. Did a lot of heavy housework yesterday. To rest, keep a pad on, call with bleeding. If still concerned in a.m., may need to be seen. Probable diagnosis: leukorrhea of pregnancy."[4]

Twelve days later, the plaintiff and her husband were at a hotel in Springfield, Massachusetts. As she stepped into the shower, the plaintiff noticed that she was bleeding from her vagina. As it was the weekend, she called

---

[4] Leukorrhea of pregnancy is characterized by a profuse, excessive, thick, white discharge from the vagina.

the defendant and left a message with an operator. A physician returned her call and advised her to return to New Haven so that she could be examined at Yale-New Haven Hospital. The plaintiff and her husband began the trip to New Haven but pulled over and called the physician after the bleeding had become worse. The physician advised her to head directly to Baystate Medical Center in Springfield because that was the closest hospital.

The plaintiff was admitted and examined by a physician at the hospital. A sonogram revealed that the plaintiff had very little amniotic fluid left in the amniotic sac. She was advised that if the volume of fluid did not increase, she might have to terminate the pregnancy.

The next day, the plaintiff was transferred to Yale-New Haven Hospital where another ultrasound examination confirmed the loss of amniotic fluid. The plaintiff was diagnosed as having suffered premature rupture of her amniotic membrane. The treating physician advised the plaintiff that she needed to induce labor because the loss of amniotic fluid made the plaintiff susceptible to a life-threatening infection. Labor was induced and the plaintiff delivered a twenty-one week old baby boy who died shortly after delivery.

On appeal, the only issue we must resolve is whether the trial court appropriately charged the jury with the proper standard of care.[5] The trial court instructed the jury as follows with respect to the applicable standard of care: "[T]he prevailing professional standard of care in this case is the level of care, skill and treatment which

---

[5] As an alternate argument, the defendant contends that, in the event we conclude that the trial court improperly articulated the standard of care, the error was harmless because the trial court improperly permitted the plaintiff's causation expert, Thomas Talley, a board certified obstetrician and gynecologist, to offer his opinion as to legal causation. We do not reach this contention because we conclude that the trial court properly instructed the jury as to the standard of care.

in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by a reasonably prudent nurse-midwife engaged in the practice of obstetrics and gynecology. This is the standard upon which you must focus."[6]

[6] The trial court's instruction regarding the standard of care provided in relevant part: "The plaintiff in this case . . . claims that she has been injured through the professional negligence of the defendant . . . . Negligence is the violation of a legal duty which one person owes to another to care for the safety of that person. The legal duty that a health care provider such as [the defendant] owes to a patient such as [the plaintiff] has been established by our legislature. We have a statute [General Statutes § 52-184c (a)] that provides the following: In any civil action to recover damages resulting from personal injury in which it is alleged that such injury resulted from the negligence of a health care provider the claimant shall have the burden of proving by a preponderance of the evidence that the alleged actions of the health care provider represented a breach of the prevailing standard of care for that health care provider. The prevailing professional standard of care for a given health care provider shall be that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers. Now, a similar health care provider is defined by statute [General Statutes § 52-184c (b)]. In this case, a similar health care provider is one who: [1] is licensed by the appropriate regulatory agency of this state or another state requiring the same or greater qualifications, and [2] is trained and experienced in the same discipline or school of practice and such training and experience shall be as a result of the active involvement in the practice or teaching of medicine within the five year period before the incident giving rise to the claim. Don't worry, I'll make this simple in a moment. As you know, the defendant . . . provided medical care to the plaintiff through [Brekus-Watson]. [Brekus-Watson] is a nurse-midwife engaged in the practice of obstetrics and gynecology. The prevailing professional standard of care that applies to her is thus the level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent nurse-midwives engaged in the practice of obstetrics and gynecology. In order to establish liability the plaintiff must prove by a preponderance of the evidence that [Brekus-Watson's] actions represented a breach of the prevailing professional standard of care that I've just described. The standard of care to be applied is the standard prevailing at the time of the treatment in question. In this case the treatment in question occurred in 1992. The standard of care to which I have referred is a nationwide standard of care. A nurse-midwife such as [Brekus-Watson] is held to the same prevailing professional standard of care applicable to nurse-midwives across the nation. For this reason the particular state in which an expert witness has practiced is

In this appeal, the plaintiff claims that the trial court improperly charged the jury on the standard of care to be applied in the case. Specifically, the plaintiff contends that the effect of the trial court's charge was to establish a lower standard of care by which the jury would determine whether negligence existed in the case. The plaintiff contends that the standard of care to be applied should have been that of a *"reasonably*

---

unimportant. You should consider the testimony of all the experts who have testified in light of their familiarity or lack of familiarity with the national standard of care to which I have referred. I have already mentioned that the prevailing professional standard of care in this case is the level of care, skill and treatment which in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by a reasonably prudent nurse-midwife engaged in the practice of obstetrics and gynecology. This is the standard upon which you must focus."

The plaintiff objected to the charge both before it was delivered to the jury and after the jury was instructed. Before the jury was given the charge, the plaintiff objected as follows: "[O]ur first objection to the court's proposed charge . . . is that the charge as the court intends to give it is, legally incorrect. In particular, that the charge should be that the standard of care is what's acceptable and appropriate, what should have been done by professionals engaged in the practice of obstetrics and gynecology and that rather than some standard of nurse-midwifery. We think it's very clear from the case law that the standard is that of the particular medical area involved, which is in this case obstetrics, the care of pregnant women. So where you say, the reasonably prudent nurse-midwife, we think it should be the reasonably prudent professional engaged in the practice of obstetrics and gynecology. Similarly, Your Honor, where your proposed instructions relate to the negligence or actions of [Brekus-Watson], we believe that should be the actions or negligence of [the defendant]. Which is the only defendant in this case."

After the jury was instructed, the plaintiff excepted to the charge given as follows: "I want to except to the portion of the charge in which you defined the standard of care, professional negligence and our position is that the health care provider is [the defendant] and that the charge was . . . defective, legally defective, because the court improperly charged the jury that they should be—that the professional standard of care that was applicable was . . . what a reasonably prudent nurse-midwife would have done. Also, that we believe that the correct charge was that the plaintiff needed to prove by a preponderance of the evidence that [the defendant's] actions, as opposed to [Brekus-Watson's], which is what you charged, representing a breach of the prevailing professional standard.

"That's our only exception for the record."

*prudent professional* engaged in the practice of obstetrics and gynecology," and not that of a *"reasonably prudent nurse-midwife* engaged in the practice of obstetrics and gynecology." (Emphasis added.) The defendant responds that the trial court's charge did not establish a lower standard of care and that the jury instruction was correct because it was in accordance with the actual evidence presented in the case. We agree with the defendant.

We begin by stating the appropriate standard of review. "The test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law." (Internal quotation marks omitted.) *Daley* v. *Aetna Life & Casualty Co.*, 249 Conn. 766, 786, 734 A.2d 112 (1999). "The court is under no duty at any time to charge in the exact language requested. *State* v. *Maresca*, 173 Conn. 450, 460, 377 A.2d 1330 (1977); *Radwick* v. *Goldstein*, 90 Conn. 701, 706, 98 A. 583 (1916)." (Internal quotation marks omitted.) *Skrzypiec* v. *Noonan*, 228 Conn. 1, 20, 633 A.2d 716 (1993). "The correctness of a charge is determined by the proof offered during the course of the trial." *Monterose* v. *Cross*, 60 Conn. App. 655, 660, 760 A.2d 1013 (2000). Thus, we must determine "whether the charge as a whole presents the case to the jury so that no injustice will be done." *State* v. *Derrico*, 181 Conn. 151, 170, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980).

After the plaintiff's objection to the charge as it was to be given to the jury; see footnote 6 of this opinion; the trial court stated to counsel for the parties: "My understanding of the claim here is that [Community Health Care Plan, Inc.], I understand, is the defendant but it's through the alleged negligent actions of [Brekus-Watson] that [the defendant] would be liable and so it's

the standard of care for her and her actions that I believe are appropriate to be reviewed in this case and that also goes to your claim that we should talk about [the defendant] and not [Brekus-Watson's] actions. I say in my charge that [the defendant] acts through its agents and [Brekus-Watson] is its agent and any negligence that she performed or conducted is attributable to [the defendant], so I think that I get to where you want to be in another way. I understand you think it's not the appropriate way but we differ on that."

We agree with the trial court's characterization of the plaintiff's case. Our careful review of the record reveals that the plaintiff's theory of the case at the trial court was one of vicarious liability. In other words, under the doctrine of respondeat superior, the defendant could be held liable for the negligent acts of its employee, Brekus-Watson. This was not a case regarding any purported institutional negligence on the part of the defendant, nor has the plaintiff cited any evidence to support that theory.[7]

The case, as presented to the jury, centered on Brekus-Watson's decision not to advise the plaintiff to come in for an examination. Thus, *her* actions were relevant to the question of negligence. The plaintiff's standard of care expert, John Sussman, a board certified obstetrician and gynecologist, agreed that this was the plaintiff's theory of the case. Sussman testified: "I'm under the understanding [that the case] is about how a person, a practitioner of obstetrics and gynecology,

---

[7] Although the plaintiff's complaint *alleges* institutional negligence on the part of the defendant, the plaintiff failed to present any evidence concerning that theory. This was due, in part, because the plaintiff had not timely disclosed to the defendant that the plaintiff's experts would offer opinions regarding institutional negligence. The trial court ruled that, pursuant to Practice Book § 13-4 (4), an expert may not offer an opinion in an area not disclosed to the other party, if that party will suffer undue prejudice. The plaintiff does not challenge that ruling on appeal.

handled a complaint *and not how [a health mainte-nance organization] handled a complaint.*" (Emphasis added.) When the trial court instructed the jury that it should examine Brekus-Watson's actions in light of a reasonably prudent nurse-midwife, it was correctly seeking the jury's response to the question of Brekus-Watson's breach of a duty owed to the plaintiff, for which the defendant, as her employer, would be vicariously liable.

Despite the plaintiff's argument to the contrary, the trial court's statement of the standard of care comports with General Statutes § 52-184c (a),[8] which establishes the standard of care to be applied in a medical malpractice case. Section 52-184c (a) provides in relevant part: "The prevailing professional standard of care for a given health care provider shall be that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." A "health care provider" is a statutorily defined term, meaning "any person, corporation, facility or institution licensed by the state to provide health care or professional services, *or an officer, employee or agent thereof acting in the course and scope of his employment.*" (Emphasis added.) General Statutes § 52-184b (a).

Thus, under the statute, the relevant health care provider in the case could have been either the defendant,

---

[8] General Statutes § 52-184c (a) provides: "In any civil action to recover damages resulting from personal injury or wrongful death occurring on or after October 1, 1987, in which it is alleged that such injury or death resulted from the negligence of a health care provider, as defined in section 52-184b, the claimant shall have the burden of proving by the preponderance of the evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider. The prevailing professional standard of care for a given health care provider shall be that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers."

as the corporate entity providing health care services to the plaintiff, or Brekus-Watson, as the individual caregiver and an employee of the defendant. Because the plaintiff's case centered upon Brekus-Watson's decision not to advise the plaintiff to come in for an examination, Brekus-Watson served as the health care provider for purposes of this negligence action and not the defendant.

The gravamen of the plaintiff's argument on appeal relies upon the erroneous assumption that the trial court's charge established a lower standard of care by which the jury should evaluate Brekus-Watson's actions. To the contrary, no evidence was presented that Brekus-Watson, as a certified nurse-midwife, should be held to a lower standard of care than any other practitioner of obstetrics and gynecology. Sussman testified that, in terms of the practice of obstetrics, it made no difference that the individual whose actions were being examined in the case was a certified nurse-midwife.[9] This was not a case, therefore, in which the evidence presented at trial established that, as a nurse-

---

[9] The following colloquy occurred during the plaintiff's direct examination of Sussman:

"Q. You're aware in this case at issue is what a health maintenance organization did when a patient called in with complaint of a vaginal discharge, right?

"A. Yes.

"Q. And that there is some dispute in fact about how the vaginal discharge was described?

"A. Yes. I'm under the understanding, which is about how a person, a practitioner of obstetrics and gynecology handled a complaint and not how a [health maintenance organization] handled a complaint.

"Q. Okay. . . . [Is] a certified nurse-midwife a practitioner of obstetrics and gynecology?

"A. *Absolutely.*

"Q. Okay. And if that certified nurse-midwife were then an employee of [a health maintenance organization], would that make a difference on your— in your opinion of the case?

"A. *Not as far as the practice of obstetrics goes.* I don't know about the legal ramifications." (Emphasis added.)

midwife, the jury should hold Brekus-Watson to a lower standard of care than any other practitioner engaged in the practice of obstetrics and gynecology. The trial court's refusal to charge as to a reasonably prudent *professional*, therefore, was of no moment in this case because there was no disagreement that Brekus-Watson should be held to the same professional standards as any other practitioner of obstetrics and gynecology. Simply put, the charge as to a reasonably prudent *nurse-midwife* did not instruct the jury that it was to hold Brekus-Watson to a lower standard than any other practitioner engaged in the field of obstetrics and gynecology.

Brekus-Watson testified that she had no reason to schedule the plaintiff for an examination because the plaintiff's factual account of the discharge, as conveyed to Brekus-Watson in the telephone call, was inconsistent with a release of amniotic fluid. Brekus-Watson testified, however, that if the plaintiff *had* experienced a release of amniotic fluid, the plaintiff would need to be examined in person.[10] Similarly, Sussman testified

---

[10] The following colloquy occurred during cross-examination of Brekus-Watson by the defendant:

"Q. Do you remember [Sussman] saying that . . . talking about discharge during pregnancy, that there is no need to bring the patient in to personally evaluate if there is no suspicion of amniotic fluid, and there are no symptoms?

"A. Yes, I recall that.

"Q. By the time you had conducted your interview with [the plaintiff] were you suspicious of amniotic fluid?

"A. No, [I wasn't] because of all of the answers that she gave to my questions.

"Q. The other part of that, that [Sussman] said is where there are no symptoms, did [the plaintiff] report any symptoms to you?

"A. No sir.

"Q. In fact, you've written in your note that she had no bleeding and no pain?

"A. That's correct.

"Q. And based on the report that [the plaintiff] gave to you, of a milky white discharge that was heavier than usual, that she had no symptoms, and . . . that she had previously done some heavy housework, you believed that there was no suspicion of amniotic fluid, is that right?

that if he could rule out a release of amniotic fluid, a patient such as the plaintiff would not need to be seen.[11] Both parties agreed, therefore, that the standard of care to which a practitioner of obstetrics and gynecology should be held would require that a person reporting symptoms consistent with a release of amniotic fluid must be examined in person.

The case, therefore, turned on a dispute regarding the contents of the telephone call between the plaintiff and Brekus-Watson. Brekus-Watson testified that, during the telephone call, the plaintiff described the discharge as being "milky" rather than "watery" in color and consistency. The plaintiff, however, testified that she told Brekus-Watson on the telephone that the discharge was more like water. A resolution of whether the discharge was amniotic fluid, thus triggering Brekus-Watson's responsibility to schedule the plaintiff for an examination, was for the jury to resolve. Because, at trial, there was no dispute that Brekus-Watson was to be held to the same standard of care as any other practitioner engaged in the practice of obstetrics and gynecology, we do not construe the charge, as given, to have been legally incorrect.

---

"A. Yes, I did.

"Q. And that's why you didn't have her come in?

"A. That's correct.

"Q. You told her that if anything changed, if she had further concerns, if the discharge increased, she should call back?

"A. Yes, I did.

"Q. And you didn't hear from her again?

"A. No sir, I didn't."

[11] The following colloquy occurred during cross-examination of Sussman by the defendant:

"Q. Okay. And if there was no reason for you to suspect that [the release] was amniotic fluid, you wouldn't have her come in, right?

"A. Correct.

"Q. And you would base that judgment on whether—whether to have her come in or not, on your clinical judgment, right?

"A. Right."

The plaintiff contends that nurse-midwives are not independent health care providers, claiming, rather, that they are part of a team, directed by an obstetrician-gynecologist, which delivers obstetrical care. See General Statutes § 20-86a (1).[12] According to the plaintiff, therefore, the trial court should have instructed as to a higher standard of care than merely that of a reasonably prudent nurse-midwife. We disagree. On the basis of the evidence presented in this case, and the way in which this case was tried, the question properly presented to the jury was whether Brekus-Watson's conduct met the standard of care applicable to her as a nurse-midwife.

We do not suggest by this decision that, where a nonphysician health care provider is employed in a physician's office and is, therefore, under the supervision of a physician, the standard of care applicable to that provider under § 52-184c is lower than that applicable to the physician. In the manner in which the present case was tried in the trial court, it did not present that question and, therefore, it is not properly before us in this appeal. We will address that question when it is properly presented to us.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[12] General Statutes § 20-86a (1) provides: " 'Nurse-midwifery' means the management of care of essentially normal newborns and women, antepartally, intrapartally, postpartally and gynecologically, occurring within a health care team, directed by a qualified obstetrician-gynecologist."