LESLIE A. HARLAN ET AL. *v.* NORWALK
ANESTHESIOLOGY, P.C., ET AL.
(AC 22039)

Lavery, C. J., and Dranginis and Peters, Js.

Argued December 3, 2002—officially released March 18, 2003

*James R. Fogarty*, with whom, on the brief, was *Carolyn Alexander Collins*, for the appellants (plaintiffs).

*Frank W. Murphy*, with whom was *Kara A. T. Murphy*, for the appellee (defendant Norwalk Hospital Association).

*Robert J. Cooney*, with whom was *Suzannah K. Nigro*, for the appellees (named defendant et al.).

PETERS, J. This case concerns the tragic circumstances of a new mother who, immediately after giving birth to a healthy baby, suffered a stroke that left her with severe physical and psychological handicaps. The underlying issue is whether a jury reasonably could have found that her stroke resulted from a preexisting brain defect rather than from the malpractice of her anesthesiologist. This issue comes to us by way of challenges to the instructions that the trial court gave to the jury and to the restraints that the court imposed on closing argument. The trial court accepted the verdict of the jury in favor of the anesthesiologist, denied the mother's motion to set the verdict aside and rendered a judgment accordingly. The mother and her husband have appealed. We affirm the judgment of the trial court.

The plaintiff, Leslie A. Harlan, and her husband, Scott Spector,[1] an ophthalmologist, filed an eight count complaint against a number of defendants, including Richard Hughes, her attending anesthesiologist, and his employer, Norwalk Anesthesiology, P.C.[2] Each of the defendants denied liability. A jury, in response to an interrogatory, found that Hughes was not liable for malpractice because he had not deviated from the standard of care of an anesthesiologist entrusted with the care and treatment of the plaintiff.[3]

---

[1] Because Spector's claim is entirely derivative of his wife's claim, we will refer to Leslie A. Harlan as the plaintiff in the singular.

[2] These defendants included the plaintiff's obstetricians and the hospital where she suffered the stroke. The plaintiff settled her claim with the obstetricians before trial. Other defendants then filed notices of apportionment claims against the obstetricians. The plaintiff does not claim that any other defendant owed her any duty independent of that of Hughes and his anesthesiology private corporation.

[3] Jury interrogatory number one asked: "Do you find that the defendant, Dr. Richard Hughes, deviated from the standard of care in the care and treatment of the plaintiff, Leslie A. Harlan, on March 7, 1995?" The jury answered, "No."

On appeal, the plaintiff challenges (1) the instructions of the trial court with respect to learned treatises and to statements that allegedly were admissions and (2) the limitations that the court imposed on closing argument by the plaintiff's counsel, including the court's ruling that Hughes and Norwalk Anesthesiology, P.C., were not, as a matter of law, agents of the defendant Norwalk Hospital Association (Norwalk Hospital). If the court engaged in some reversible error, we must then consider (3) whether the plaintiff's malpractice action was barred by the plaintiff's failure to produce an expert to rebut Hughes' expert testimony about the cause of the plaintiff's injury.

The jury reasonably could have found the following facts. On the morning of March 7, 1995, the plaintiff was admitted to Norwalk Hospital because she was suffering labor pains associated with her pregnancy. At 6 p.m., because of signs of mild fetal distress, her obstetricians decided to perform a cesarean section rather than allowing normal vaginal delivery. During the operation, which began twenty minutes later, the plaintiff's blood pressure decreased. To remedy this situation, Hughes gave her injections of ephedrine and robinal. As a result, her blood pressure rose beyond what it should have been. In response, Hughes gave the plaintiff an injection of labatelol, which reduced the plaintiff's blood pressure to a normal range.

A healthy baby was delivered at 6:28 p.m. and was greeted joyfully by the plaintiff and her husband. At 7:05 p.m., accompanied by Hughes, her obstetrician and a nurse, the plaintiff was moved to a recovery room. Her blood pressure was somewhat high. Although she complained of a headache, she otherwise was behaving normally. She was alert, her color was good, and she was not slurring her words.

At 7:15 p.m., after transferring the plaintiff's care to another anesthesiologist, Hughes left the hospital. The

nurse left fifteen minutes later, after having checked on the plaintiff's condition and having observed that the plaintiff was not demonstrating any difficulty.

At 7:30 p.m., the plaintiff suffered a stroke. Hughes immediately ordered a CT scan and returned to the hospital.

Later tests established that the plaintiff had a congenital defect in the blood vessels on the left side of her brain. These blood vessels burst as a result of hormonal and fluid changes that are released into a woman's system after childbirth. According to several defense experts, this congenital brain defect, rather than changes in her blood pressure, caused the stroke.

The plaintiff introduced no expert testimony to the contrary. Although many experts testified on her behalf, they questioned the propriety of the injections that were intended to stabilize her blood pressure but did not discredit the tests that established her congenital brain defect. The plaintiff has not alleged that she was surprised by the disclosure of these tests or by expert testimony describing the linkage between her brain defect and her stroke. Indeed, in her reply brief she concedes that the trial court admitted into evidence all that she had sought to introduce.

## I

We turn first to the plaintiff's disagreement with the court's instructions to the jury. In two respects, the court limited the jury's use of certain evidence as relevant only to the jury's evaluation of the credibility of the witnesses whom it had heard. The plaintiff argues that the jury should have been permitted to make substantive use of (1) excerpts from a learned treatise that was an exhibit at trial and (2) inconsistent statements by defense witnesses. We will address each of these claims of impropriety separately. In the absence of

essential findings of fact, we find neither claim to be persuasive.

A

The learned treatise issue arose as follows. The trial court permitted a medical treatise, Clinical Anesthesia (P. Barash, B. Cullen & R. Stoelting eds., 2d Ed. 1992), to become an exhibit at trial. Excerpts from this learned treatise discussed the management of changes in a patient's blood pressure. The treatise did not address the management of obstetrical anesthesiology. Nonetheless, the plaintiff wanted the jury to consider these excerpts for their substantive merits rather than, as the court ruled, for their relevance to the credibility of a defense expert witness.

The plaintiff sought the admission of the learned treatise into evidence not through direct examination of her own witnesses but through cross-examination of an expert witness produced by Hughes. "Connecticut permits the introduction of professional and scientific treatises and journals on cross-examination of an expert witness to impeach the expert's testimony if the expert has either relied on the work in direct examination or acknowledged the work as accepted by the profession. Conn. Code Evid. § 8-3 (8)." *Musorofiti* v. *Vlcek*, 65 Conn. App. 365, 383, 783 A.2d 36, cert. denied, 258 Conn. 938, 786 A.2d 426 (2001); see also *Cross* v. *Huttenlocher*, 185 Conn. 390, 395, 440 A.2d 952 (1981); C. Tait, Connecticut Evidence (3d Ed. 2001) § 7.11.2, p. 539.

The court declined the plaintiff's request that the excerpts should be made available to the jury without restriction. It ruled that they would be admissible only "for the purpose of this [j]ury assessing the credibility of this witness and the reliability of this witness' expert testimony. It is not [for] the purpose of . . . [establishing] that the treatise creates the standard of care."

The trial court had the authority to limit the admissibility of the excerpts from the learned treatise because the plaintiff had not satisfied the factual preconditions for their plenary consideration. The expert witness through whom the plaintiff introduced the treatise into evidence acknowledged having a copy of the treatise in his office. The court found, however, that he had *not* accepted the treatise as authoritative. The plaintiff has not challenged the validity of this finding.

The plaintiff maintains, however, that, as a matter of law, the trial court acted improperly because it overlooked § 8-3 (8) of the Connecticut Code of Evidence.[4] We review issues of statutory construction in a plenary fashion. *King* v. *Sultar*, 253 Conn. 429, 437–38, 754 A.2d 782 (2000); *Millward Brown, Inc.* v. *Commissioner of Revenue Services*, 73 Conn. App. 757, 761, 811 A.2d 717 (2002).

The plaintiff cites the provision of § 8-3 (8) that permits introduction of professional and scientific treatises on cross-examination of an expert witness if the expert has either relied on the work in direct examination or acknowledged the work as accepted by the profession. This language codifies preexisting Connecticut law. *Musorofiti* v. *Vlcek*, supra, 65 Conn. App. 383. Indeed, the code in its entirety "is a restatement . . . of our current evidentiary case law." D. Borden, "The New Code of Evidence: A (Very) Brief Introduction and Overview," 73 Conn. B.J. 210, 212 (1999).

On its face, the plaintiff's argument cannot succeed because the court found that she had *not* met the preconditions set out in the code. More fundamentally,

---

[4] Connecticut Code of Evidence § 8-3 (8) provides: "To the extent called to the attention of an expert witness on cross-examination or relied on by the expert witness in direct examination, a statement contained in a published treatise, periodical or pamphlet on a subject of history, medicine, or other science or art, *recognized as a standard authority in the field by the witness, other expert witness or judicial notice*." (Emphasis added.)

however, the plaintiff's reliance on § 8-3 (8) is misplaced. She construes the code provision as stating a rule that mandates the admission of a learned treatise for substantive purposes. The code provision does not say that. The heading of § 8-3 is "Hearsay Exceptions: Availability of Declarant Immaterial." Its opening words are: "The following are *not excluded* by the hearsay rule, even though the declarant is available as a witness . . . ." (Emphasis added.) Section 8-3 (8), therefore, did not require the court to admit the learned treatise into evidence for all purposes. Section 8-3 (8) does not purport to circumscribe the discretion generally afforded to a trial court to determine the admissibility of evidence in light of the facts of record.

In sum, we conclude that the trial court had the authority to limit the admissibility of the learned treatise to use for credibility purposes. The plaintiff failed to elicit the necessary foundation for admissibility in her cross-examination of the defendants' expert witness. She has failed to present any alternate reason that would require plenary admission of the treatise into evidence.

## B

The plaintiff's alternate claim of instructional error rests on the refusal of the trial court expressly to characterize certain statements by the defendants as admissions and its consequent failure to instruct the jury that it could make substantive use of such alleged admissions. We review a court's instructions to ascertain whether they reasonably could be said to have misled the jury. See, e.g., *Ali* v. *Community Health Care Plan, Inc.*, 261 Conn. 143, 150, 801 A.2d 775 (2002); *Marchell* v. *Whelchel*, 66 Conn. App. 574, 588–89, 785 A.2d 253 (2001). Instructions that are correct as a matter of law cannot be characterized as misleading. The charge was correct in this case because the plaintiff's claim lacked

the required factual foundation. Accordingly, the plaintiff cannot prevail on this claim.

The plaintiff's argument centers on her allegation that, in various depositions and interrogatory answers, the defendants and their agents made statements about the time at which Hughes gave the plaintiff injections to stabilize her blood pressure. In her view, because this trial testimony was inconsistent with their deposition and interrogatory testimony, their statements should have been described to the jury as admissions.

The trial court unconditionally admitted the trial testimony and the deposition and interrogatory evidence. The court permitted the plaintiff to use the earlier statements in her cross-examination of defense witnesses. The court instructed the jury, however, that it could use such possible inconsistencies only to evaluate the credibility of the witnesses that it had heard. By contrast, the court instructed the jury that the *plaintiff's* out-of-court statements were proof of the facts described therein.

The plaintiff did not question the sufficiency of the court's charge on inconsistent statements until the court had completed charging the jury. She acknowledged that she had not previously raised any issue with respect to this charge.[5]

The fundamental difficulty with the plaintiff's claim, however, is not that it was made at the eleventh hour. The difficulty, instead, is that she did not provide a foundation for her claim when she made it. Her argument lacked both a legal and a factual basis. She cited no authorities in support of her objection to the trial

---

[5] The instructional issue arose in the following procedural context. The court discussed all of its proposed jury instructions with all counsel in a two day charge conference. Although the plaintiff, through counsel, participated in the conference, she did not raise the issue that inconsistent statements might be evidentiary admissions.

court. She did not identify the statements that allegedly were admissions except to refer generally to the testimony of four specified defense witnesses "to the extent that there are inconsistent statement[s] made by them." That was not enough. "Whether a party's statement is a judicial admission or an evidentiary admission is a factual question for the trial court." C. Tait, supra, § 8.16.3, p. 585; see also *Sweet* v. *Sweet,* 190 Conn. 657, 662, 462 A.2d 1031 (1983). The plaintiff does not claim that she ever asked the trial court to make such a finding.

We conclude, therefore, that the trial court properly instructed the jury in this case. The court properly declined the plaintiff's request that the jury should be entitled to make substantive use of excerpts from a learned treatise or from alleged inconsistencies in the testimony of defense witnesses. In both respects, the court properly limited the evidence to bear only on the credibility of the witnesses whom the jury had heard.

## II

The plaintiff also claims that the verdict should be set aside because, in her view, the trial court improperly restricted her closing argument to the jury. To remand this case for a new trial, we would have to decide that the court acted in abuse of its discretion. See, e.g., *Skrzypiec* v. *Noonan,* 228 Conn. 1, 15–16, 633 A.2d 716 (1993); *Marchell* v. *Whelchel,* supra, 66 Conn. App. 586. We are persuaded that the court did not do so.

The plaintiff claims that the trial court improperly (1) restricted the time for her closing argument to one hour, (2) disallowed the presentation of an argument on adverse inferences, (3) limited the use of enlargements and (4) disallowed an argument with respect to a claim of apportionment between some of the defendants. We disagree with each of these claims.

The plaintiff claims that her malpractice case was so complex that she needed more than one hour to present it properly. She directs us to *State* v. *Nyman*, 55 Conn. 17, 18–19, 10 A. 161 (1886), which, relying on the proposition that "[f]rom time immemorial . . . each party . . . has had the privilege of being heard by two counsel," held that a statutory one hour limit did not apply when a criminal defendant was represented by two counsel. Id. The case before us is not a criminal case, and this plaintiff did not have two counsel.[6] More important, as best we can tell, *Nyman* has never been cited in any subsequent Supreme Court or Appellate Court decision for the plaintiff's proposition. The more persuasive authority is Practice Book § 15-7, which provides that "[t]he argument on behalf of any party shall not occupy more than one hour, unless the judicial authority, on motion for special cause, before the commencement of such argument, allows a longer time." See also General Statutes § 52-209.[7] We conclude that the trial court did not abuse its discretion in declining to find that the plaintiff had established "special cause" for a longer argument.

The plaintiff further claims that the trial court abused its discretion by denying her permission to argue, in her closing argument, that the jury should draw an adverse inference from the defendants' failure to call certain witnesses to testify. In response to a defense motion, the court precluded the plaintiff from making this "missing witness" argument because she had failed to establish the availability of the allegedly missing witnesses. See General Statutes § 52-216c;[8] *Raybeck* v.

---

[6] Although two attorneys participated in the case, they were members of the same law firm.

[7] General Statutes § 52-209 provides in relevant part that "[i]n a trial before the Superior Court, counsel shall not occupy more than one hour in argument, unless the court, on motion for special cause, before the commencement of the argument, allows a longer time. . . ."

[8] General Statutes § 52-216c provides in relevant part: "No court in the trial of a civil action may instruct the jury that an inference unfavorable to

*Danbury Orthopedic Associates, P.C.*, 72 Conn. App. 359, 367, 805 A.2d 130 (2002); *Krupien* v. *Rai*, 56 Conn. App. 247, 249, 742 A.2d 1270 (1999), cert. denied, 252 Conn. 931, 746 A.2d 793 (2000). We agree with the court. It was not sufficient for the plaintiff to show that each of the "missing witnesses" had a valid state license that showed a state address. A license holder has no obligation to be in this state at any particular period of time.

The plaintiff also argues that the trial court abused its discretion by denying her request that, at closing argument, she be able to present enlargements of certain parts of the trial transcript. The court precluded the plaintiff from presenting the enlargements because of the plaintiff's failure to comply with the court's order that opposing counsel be notified, in advance, of an intention to use such a demonstrative aid.[9] The court, however, permitted the plaintiff, in her closing argument, to read from the transcript or to write excerpts out on a board in the courtroom. The plaintiff does not claim that she complied with the court's notice order. She does not question the court's authority to enter such an order. We are persuaded that the court did not abuse its discretion by enforcing its notice order in the manner that it did.

The plaintiff's final claim with respect to her closing argument is that she should have been permitted to inform the jury about a pending motion for apportionment of liability among the various defendants. We need

---

any party's cause may be drawn from the failure of any party to call a witness at such trial. However, counsel for any party to the action shall be entitled to argue to the trier of fact during closing arguments . . . that the jury should draw an adverse inference from another party's failure to call a witness *who has been proven to be available to testify.*" (Emphasis added.)

[9] In denying the plaintiff's motion to set aside the verdict, the court reiterated that the reason for its preclusion order was that, in fairness, the defendants should have been given "an equal opportunity" to present enlargements.

not review the merits of this claim in light of our rejection of the plaintiff's other claims of impropriety. Without a persuasive argument that the jury verdict absolving Hughes was flawed, it is irrelevant that, had the outcome been different, various defendants might have had legal claims against each other.

We conclude, therefore, that the plaintiff has failed to demonstrate that the trial court improperly limited her closing argument to the jury. The court acted well within its discretionary authority to monitor the propriety of the arguments that the plaintiff sought to present to the jury.

### III

Although we have affirmed the judgment of the trial court in all respects, it bears noting that, even if one of the plaintiff's arguments had been persuasive, she still could not have prevailed. We would have had to affirm the judgment of the court "because it reached the right result, even if it did so for the wrong reason." *Kalas* v. *Cook*, 70 Conn. App. 477, 485, 800 A.2d 553 (2002); see also *Flagg Energy Development Corp.* v. *General Motors Corp.*, 244 Conn. 126, 151, 709 A.2d 1075 (1998).

The defendants were entitled to a judgment on their behalf because the plaintiff failed to present an expert witness to address the relationship between her injury and her brain defect. In her appellate briefs, she has not contested the existence of this brain defect. Indeed, she has not addressed the brain defect in any fashion.

Presumably, the plaintiff expected the jury to uphold her malpractice claim of improper blood pressure treatment as the cause of her stroke, despite the existence of her brain defect. She does not maintain that, in the course of trial, she contested the existence of the brain defect. A fortiori, she presented no expert evidence that

might have explained to the jury the impact of the brain defect on her claim that Hughes was guilty of malpractice. Her expert witness discussed the proper treatment for fluctuations in blood pressure and nothing else.

Our courts repeatedly have held, however, that a malpractice action can only rarely be pursued without expert evidence to educate the jury about the appropriate standard of care of a treating physician in the circumstances that the physician encountered. "The requirement of expert testimony . . . serves to assist lay people, such as members of the jury and the presiding judge, to understand the applicable standard of care and to evaluate the defendant's actions in light of that standard. . . . Expert testimony is *required* when the question involved goes beyond the field of the ordinary knowledge and experience of judges or jurors." (Citation omitted; emphasis in original; internal quotation marks omitted.) *LePage* v. *Horne*, 262 Conn. 116, 125, 809 A.2d 505 (2002). "[T]o prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury. . . . Generally, expert testimony is required to establish both the standard of care to which the defendant is held and the breach of that standard." (Internal quotation marks omitted.) *Amsden* v. *Fischer*, 62 Conn. App. 323, 331, 771 A.2d 233 (2001); see also *Trimel* v. *Lawrence & Memorial Hospital Rehabilitation Center*, 61 Conn. App. 353, 357–58, 764 A.2d 203, appeal dismissed, 258 Conn. 711, 784 A.2d 889 (2001). "Except in the unusual case where the want of care or skill is so gross that it presents an almost conclusive inference of want of care . . . the testimony of an expert witness is necessary to establish both the standard of proper professional skill or care on the part of a physician . . . and that

the defendant failed to conform to that standard of care." (Citations omitted; internal quotation marks omitted.) *Doe* v. *Yale University*, 252 Conn. 641, 687, 748 A.2d 834 (2000).

These precedents control this case. The jury was entitled to expert guidance about the relationship between her blood pressure irregularities, her brain defect and her stroke. Without expert testimony, the jury might well have gone astray in its assessment of whether Hughes' conduct comported with the standard of care demanded in these circumstances. The relationship between the relevant events was not so obvious, the alleged failure to exercise due care was not so gross, that the plaintiff was relieved of the burden of providing such expert testimony.

We do not know, of course, why the jury decided, even without expert guidance, that Hughes was not liable to the plaintiff because he had not deviated from the standard of care of an anesthesiologist entrusted with the care and treatment of the plaintiff. We do know that, if the jury had decided differently, the trial court would have been required to set that verdict aside as a matter of law.

No one can learn of the plaintiff's tragic injury without compassion for her physical and mental state. Nonetheless, we conclude that the trial court properly addressed the plaintiff's instructional claims and had the authority to limit aspects of her closing argument to the jury. We further conclude that, in the absence of the requisite expert testimony, the jury had no basis for holding her anesthesiologist responsible for her stroke.

The judgment is affirmed.

In this opinion the other judges concurred.