ANDREW H. MARCHELL ET AL. *v.* LYNN W.
WHELCHEL, JR.
(AC 20604)

Foti, Schaller and O'Connell, Js.

Argued May 31—officially released October 30, 2001

*Peter M. Appleton,* with whom was *Peter T. Evans,* for the appellants (plaintiffs).

*Joseph M. Musco,* for the appellee (defendant).

*Opinion*

SCHALLER, J. The plaintiff, Andrew H. Marchell,[1] appeals from the judgment of the trial court, rendered following a jury trial, in favor of the defendant, Lynn W. Whelchel, Jr., in this medical malpractice action. The plaintiff claims on appeal that the court improperly (1) denied his motion to set aside the verdict, (2) admitted into evidence irrelevant and prejudicial testimony of the defendant's medical expert, (3) limited his closing argument, (4) refused to allow him to amend his complaint and (5) instructed the jury. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to the disposition of the plaintiff's appeal. On December 12, 1995, the plaintiff consulted a podiatrist, Andrew E. Schwartz, regarding the removal of a bunion on his left foot. Schwartz examined the plaintiff to deter-

---

[1] Both Andrew H. Marchell and Patricia Marchell brought the underlying action against the defendant, Lynn W. Whelchel, Jr. Because the claims on appeal deal specifically with issues that relate to Andrew H. Marchell, we refer to him as the plaintiff.

mine if he was fit to undergo a bunionectomy.[2] His examination revealed that the plaintiff had a weaker pulse in his foot. That concerned Schwartz because he thought that the weaker pulse might indicate a lack of circulation and blood flow in that area, which might impair the plaintiff's ability to heal after the bunion removal. Schwartz referred the plaintiff to the defendant, a vascular surgeon, to determine whether the plaintiff had adequate circulation to recover from the proposed procedure.[3]

On December 15, 1995, the defendant examined the plaintiff. He reviewed the plaintiff's medical history, physically examined him and performed two diagnostic tests. The initial physical examination indicated to the defendant that the plaintiff had adequate circulation in his foot. Despite those findings, the plaintiff's prior physical health and age prompted the defendant to conduct two additional tests.

The first test was a Doppler study, which is performed to assess the blood flow through a patient's arteries and into his extremities. That test requires the administering physician to hold an instrument against the patient's body at various points, listen for blood flow as it is reproduced and amplified by certain machinery, and determine at what rate, if any, blood is pumping through the patient's extremities. According to the defendant, the results of that test on the plaintiff indicated that he had an adequate amount of blood flowing through the foot.

The defendant next conducted a segmental blood pressure test, which also is called an ankle brachial

---

[2] A bunionectomy is the medical term for the removal of a bunion.

[3] Whelchel was consulted to determine if the plaintiff had, as a matter of medical parlance, "vascular sufficiency" in his foot. That also was referred to in the case as "peripheral vascular sufficiency." Those terms refer to the plaintiff's blood flow and circulation.

index (test). That test requires the administering physician to take the patient's regular blood pressure at the arm and then take another blood pressure reading at the ankle. Those readings are then compared and scaled on an index to indicate the amount of blood flow that the patient has in the extremity. The defendant conducted that test but measured the patient's blood pressure at the thigh as opposed to the ankle. Though the defendant actually performed a thigh brachial index test, he reported the results as an ankle brachial index reading. The defendant concluded that this test revealed no vascular insufficiency.

On the basis of his total examination of the plaintiff, the defendant determined that the plaintiff did not have a vascular insufficiency. He also concluded that the lack of pulse in the plaintiff's foot that Schwartz described was the result of arteriosclerosis, which is a hardening of the artery walls. That condition had made it impossible to get a pulse in the patient's foot because the affected arteries could not be compressed sufficiently to feel blood flow. Because a hardening of the arterial wall is not the equivalent of a blockage or obstruction within the artery itself, however, the defendant did not believe that condition necessarily indicated a blood flow problem.

The defendant subsequently advised Schwartz of his findings and determination of vascular sufficiency in a written report. On December 29, 1995, Schwartz performed the bunionectomy on the plaintiff's left foot. Following the procedure, the plaintiff began to experience complications. A follow-up visit to Schwartz on January 11, 1996, revealed signs of infection and that some of the tissue on the plaintiff's left foot had become necrotic.

Schwartz transferred the plaintiff on that day to the care of Dennis D. D'Onofrio, another podiatrist, at

which time the plaintiff was admitted to Charlotte Hungerford Hospital in Torrington for treatment of the infection and removal of the necrotic tissue. While at the hospital, the plaintiff underwent a Duplex study, which is similar to the Doppler examination that the defendant had earlier performed. Those test results indicated that the plaintiff had significant vascular compromise. Another ankle brachial index test was attempted at that time, but was unsuccessful because the plaintiff's arteries could not be constricted with the blood pressure cuff. On January 19, 1996, the plaintiff underwent an angiogram at the hospital, which indicated a vascular insufficiency.

On January 20, 1996, the plaintiff was transferred to the John Dempsey Hospital in Farmington, where Steven Ruby, another vascular surgeon, took charge of the plaintiff's care and continued to treat the plaintiff's infection. The infection subsequently healed despite the failure of bypass surgery to increase blood flow in the plaintiff's foot. Although that infection healed, another infection settled in the plaintiff's left great toe. The toe subsequently became gangrenous and had to be amputated on January 26, 1996. After being hospitalized again in June, 1996, the plaintiff also successfully fought off another infection in his left foot.

The plaintiff filed a medical malpractice complaint against the defendant on March 13, 1998, alleging that the defendant breached the professional standard of care for physicians in the defendant's profession. Specifically, the complaint alleged that the postbunionectomy complications were caused by the defendant's negligent failure to diagnose his peripheral vascular insufficiency and his negligent failure to perform adequate and accurate tests to assess that condition, and that the defendant improperly cleared the plaintiff to undergo the bunionectomy.

In support of his malpractice claims against the defendant, the plaintiff elicited expert testimony that, in the circumstances faced by the defendant, a vascular surgeon has a duty to perform a Doppler study and an ankle brachial index test. The plaintiff's experts further testified that those tests had to be performed to assess the plaintiff's condition adequately. They also testified that the defendant's performance of those two tests, as well as his conclusions and reporting, were below the acceptable standard of care because they were inaccurate, incorrect or both.

The defendant rebutted the testimony of the plaintiff's experts with his own testimony as an expert. As an expert on the standard of care, the defendant testified that the applicable standard does not require that an ankle brachial index test be performed to assess vascular insufficiency. He offered the opinion that no single test is a conclusive indicator of vascular condition. Rather, the standard requires a broader approach when reaching a diagnosis. A physician assessing a patient's vascular sufficiency must consider all of the elements of his evaluation in the patient's case when reaching his conclusion precisely because no single test can be relied on as conclusive.

The plaintiff also offered the results of the Duplex study and the later angiogram, which were both performed when the plaintiff was hospitalized, as evidence to prove that the plaintiff did have a vascular insufficiency.[4] The plaintiff's experts testified as to those results, and concluded that the Duplex study and the angiogram findings prove that the defendant failed to diagnose the plaintiff's condition because the defendant could not reasonably have failed to find the insuffi-

---

[4] All the experts substantially agreed that the plaintiff's condition would have remained the same from the time when the defendant examined him to the time when the subsequent tests were conducted at the hospital.

ciency only thirty days earlier when performing a similar Doppler test.

The plaintiff tried to establish that the defendant had misinterpreted the Doppler test that he had administered. He offered the testimony of Richard Hurwitz, a vascular surgeon, that it would have been impossible for the defendant, who did virtually the same study only one month earlier, to fail to detect the presence of the plaintiff's vascular insufficiency because the results of the second exam were clear and indicated vascular insufficiency. Hurwitz based his testimony on the findings of the Duplex study that was conducted when the plaintiff was hospitalized on January 11, 1996.

The defendant then offered the testimony of Steven P. Rivers, a vascular surgeon, who was called as an expert on causation. Rivers testified that the Duplex study performed on the plaintiff may have been misinterpreted because the result was reported in terms of percent of blood flow in the plaintiff's artery, yet that test really does not measure or provide such information. Rivers explained that the results of that study are subjective and qualitative because one can only listen to the blood flow and assess circulation on the basis of what he or she hears. Rivers was of the opinion that a Duplex study, therefore, cannot determine vascular sufficiency, as the plaintiff claims, because it cannot quantify the amount of circulation reduction in an artery. He also testified that, much like a Doppler study, an angiogram does not provide a quantitative measure of blood flow reduction or arterial insufficiency. Rather, that test provides information only about where blockage is located, instead of the extent to which the artery is blocked.

Rivers testified that he believed that the defendant's finding of vascular sufficiency was correct. He based that conclusion on the plaintiff's ability to heal some

of his foot infections, despite the lack of any increase in blood flow since the bypass surgery was unsuccessful, and to recover from his toe removal. According to Rivers, that was evidence that the plaintiff had vascular sufficiency because there was adequate blood flow to support healing.

The jury returned a verdict in favor of the defendant and answered the following interrogatory in the negative: "Did the plaintiff prove by a fair preponderance of the evidence that the defendant, Dr. Whelchel, deviated from the standard of care applicable to vascular surgeons as alleged in [the] complaint and was therefore negligent?" The plaintiff thereafter filed a motion to set aside the verdict, to which the defendant objected and which the court denied. This appeal followed.

I

The plaintiff's first claim is that the court improperly denied the motion to set aside the verdict because he proved that the defendant had deviated from the applicable standard of care, and the jury's finding of no deviation from the standard of care was therefore against the weight of evidence. We are not persuaded.

At the outset, we note our standard of review. "[T]he proper appellate standard of review when considering the action of a trial court granting or denying a motion to set aside a verdict and motion for a new trial . . . [is] the abuse of discretion standard. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Citation omitted; internal quotation marks omitted.) *Davis* v. *Fracasso*, 59 Conn. App. 291, 295–96, 756 A.2d 325 (2000).

"A court is empowered to set aside a jury verdict when, in the court's opinion, the verdict is contrary to the law or unsupported by the evidence. . . . A verdict should not be set aside, however, where it is apparent that there was some evidence on which the jury might reasonably have reached its conclusion." (Internal quotation marks omitted.) *Gilliard* v. *Van-Court Property Management Services, Ltd.*, 63 Conn. App. 637, 646, 777 A.2d 745 (2001). "In analyzing a sufficiency of the evidence claim, the test that we employ is whether, on the basis of the evidence before the jury, a reasonable and properly motivated jury could return the verdict that it did." (Internal quotation marks omitted.) Id. "On appellate review, therefore, we will give the evidence the most favorable reasonable construction in support of the verdict to which it is entitled." (Internal quotation marks omitted.) Id.

A

The plaintiff argues that the defendant was negligent in performing a thigh brachial index instead of an ankle brachial index to assess the vascular sufficiency in the plaintiff's foot. Specifically, to find that the defendant negligently treated the plaintiff, the jury would have to find, as a preliminary matter, that the applicable standard of care required the defendant to conduct a proper ankle brachial index test when assessing the vascular sufficiency. We disagree.

"[T]o prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury. . . . Generally, expert testimony is required to establish both the standard of care to which the defendant is held and the breach of that standard." (Internal quotation marks omitted.) *Stowe*

v. *McHugh*, 46 Conn. App. 391, 397, 699 A.2d 279, cert. denied, 243 Conn. 932, 701 A.2d 662 (1997).

Construing the evidence offered through expert testimony in the light most favorable to the defendant, the jury reasonably could have found that the defendant did not deviate from the applicable standard of care by not conducting an ankle brachial index test. Rather, the jury reasonably could have found that the pertinent standard requires a physician to consider the full constellation of evaluations and tests conducted when assessing the patient's vascular condition. Under that standard, the improper administration of one test does not cause a breach of the physician's duty of care as long as the overall assessment is adequate and accurate.

B

The plaintiff next claims that the defendant breached the standard of care applicable to a vascular surgeon assessing vascular sufficiency because he failed to diagnose the plaintiff's condition. We are not persuaded.

The expert witnesses presented the jury with conflicting opinions and conclusions on the issue of whether the plaintiff actually had a vascular insufficiency. "It is the province of the jury to weigh the evidence and determine the credibility and the effect of testimony . . . ." *Hally* v. *Hospital of St. Raphael*, 162 Conn. 352, 359, 294 A.2d 305 (1972). "[T]he jury is free to accept or reject each expert's opinion in whole or in part." (Internal quotation marks omitted.) *Shelnitz* v. *Greenberg*, 200 Conn. 58, 68, 509 A.2d 1023 (1986). There was conflicting testimony regarding the Doppler and Duplex test conclusions, and the accuracy of each test. A conflict also existed over the determinative nature of the angiogram. The jury reasonably could have concluded that the plaintiff did not have a vascular insufficiency. Because the jury reasonably could have found that the plaintiff did not have a vascular insufficiency,

it also could have found that the defendant did not fail to assess that condition and, therefore, did not breach the standard of care.

On the basis of the previously discussed conflicting evidence, the jury reasonably could have found that the defendant did not breach the standard of care owed to the plaintiff. Therefore, the court did not abuse its discretion in denying the plaintiff's motion to set aside the verdict.[5]

## II

The plaintiff next claims that the court improperly admitted into evidence irrelevant and prejudicial testimony by one of the defendant's medical experts. We are not persuaded.

"The proper standard for appellate review of a trial court's decision permitting expert opinion testimony is . . . whether there has been an abuse of discretion or clear error." *Bombero* v. *Marchionne*, 11 Conn. App. 485, 488, 528 A.2d 396, cert. denied, 205 Conn. 801, 529 A.2d 719 (1987).

The plaintiff argues that the court allowed irrelevant and prejudicial testimony into evidence because it allowed one of the defendant's expert witnesses, Rivers, who was disclosed as an expert witness on causation, to testify as to the appropriate standard of care. Specifically, the plaintiff alludes to portions of Rivers' testimony pertaining to various evaluation techniques he employs when assessing vascular insufficiency. The plaintiff asserts that this testimony was irrelevant because it had no relation to the issue of causation. The plaintiff also argues that this testimony was prejudicial because it went beyond the scope of the testimony

---

[5] Because we affirm the court's ruling on the basis of the plaintiff's failure to establish a breach of the relevant standard of care, we need not reach the issue of whether the alleged negligence caused the resulting harm.

for which Rivers was disclosed and crossed into the standard of care issue, which was a separate and specific issue in the case.

Our review of the record reveals that the court did not abuse its discretion when it allowed the defendant's causation expert to describe his experiences and evaluation techniques with regard to vascular examinations and assessments. After the plaintiff's counsel objected to Rivers' testimony, the court excused the jury and permitted counsel to present argument. The court ruled that defense counsel could question the witness, and the witness could testify, about how he performs a vascular consultation, but not what he thinks the standard of care is for vascular consultations.

The court did not abuse its discretion in making that ruling and allowing the subsequent expert testimony. As the court noted, what Rivers does in a vascular consultation is relevant to his opinion on whether the defendant's actions caused the plaintiff's injuries. It also was relevant as background information for the jury in understanding the expert's opinions. "Expert testimony should be admitted when . . . the testimony would be helpful to the . . . jury in considering the issues." (Internal quotation marks omitted.) *State* v. *Billie*, 250 Conn. 172, 180, 738 A.2d 586 (1999). Additionally, by clearly separating the issues of standard of care and causation, and limiting the direct examination of the defendant's causation expert to the issue of causation, the court ensured that there was no prejudicial effect on the plaintiff.

III

The plaintiff next claims that the court improperly ruled in front of the jury during closing argument that the plaintiff's counsel could not comment on the defendant's failure to explain test result discrepancies. That claim is without merit.

We first note the standard of review. "The trial court is invested with a large discretion with regard to the arguments of counsel, and while its action is subject to review and control, we can interfere only in those cases where the discretion was clearly exceeded or abused to the manifest injury of some party." (Internal quotation marks omitted.) *Schwarz* v. *Waterbury Public Market, Inc.*, 6 Conn. App. 429, 437, 505 A.2d 1272 (1986).

An examination of the deposition and trial record illuminates the basis for the court's ruling. During his deposition, the defendant was instructed by his attorney not to answer a question regarding the discrepancy between test results. After denying the plaintiff's motion to compel, the court ruled that the defendant would be precluded from testifying on that issue at trial.

Despite the order, in his closing argument, the plaintiff's counsel queried why the defendant did not explain those dissimilar findings. The defendant's counsel immediately objected to that comment. Sustaining the objection, the court stated: "As you know, counsel, the defendant was precluded from testifying to that."

It was not an abuse of discretion for the court to stop the plaintiff's counsel from arguing or implying that the defendant had not offered an explanation when he otherwise could because that proposition was inaccurate. It was within the court's discretion to enforce its prior ruling. See *State* v. *Eaton*, 59 Conn. App. 252, 259, 755 A.2d 973, cert. denied, 254 Conn. 937, 761 A.2d 763 (2000).

The plaintiff also argues that the court's comment itself caused him harm because it left the jury with the impression that he was presenting an improper argument to the jury. The plaintiff further argues that the comment left the jury with the impression that it could not take the discrepancy into consideration.

The plaintiff offers no legal support or analysis for either of those claims. Without any support to ground such assertions, we need not address those claims. "We are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned." (Citations omitted; internal quotation marks omitted.) *Elm Street Builders, Inc.* v. *Enterprise Park Condominium Assn., Inc.*, 63 Conn. App. 657, 659 n.2, 778 A.2d 237 (2001).

IV

The plaintiff next claims that the court improperly denied the plaintiff's motion to amend the complaint. We do not agree.

"Whether to allow an amendment is a matter left to the sound discretion of the trial court. This court will not disturb a trial court's ruling on a proposed amendment unless there has been a clear abuse of that discretion. . . . But unless there is some sound reason for denying permission to amend in order to remedy mispleading, [a request to do so] should be granted." (Internal quotation marks omitted.) *1525 Highland Associates, LLC* v. *Fohl*, 62 Conn. App. 612, 617, 772 A.2d 1128, cert. denied, 256 Conn. 919, 774 A.2d 137 (2001).

The plaintiff sought to amend the complaint on the first day of trial. A review of the record reveals that the plaintiff's amendment would have introduced a new cause of action. The plaintiff's counsel stated that he was seeking to amend the complaint, in his words, to "pare back" what he felt the plaintiff needed to prove

to establish proximate causation in the case. The court noted that the original complaint focused on the defendant's failure to identify the plaintiff's vascular insufficiency and the damages that could have been avoided by the defendant's evaluation of that condition. The amended complaint, in contrast, charged that the defendant should be liable for the complications that were a result of the surgery. The court found that this amendment would allow the jury to conclude that the defendant should be liable for any complication, regardless of whether it arose from the alleged vascular insufficiency.

The court, therefore, concluded that the amendment asserted a different cause of action because the original complaint focused on the defendant's diagnosis of the plaintiff's vascular insufficiency while the amended complaint focused on the results of the surgery. Having reached that conclusion, this was a sound reason to deny the amendment. See *Mezes* v. *Mead*, 48 Conn. App. 323, 336, 709 A.2d 597 (1998) (court should consider whether amendment will work injustice to other party or unduly delay trial in deciding whether to permit amendment). The court did not abuse its discretion in denying the plaintiff's motion to amend his complaint.

V

The plaintiff claims finally that the court improperly instructed the jury. That claim is without merit.

"Our standard of review concerning claims of instructional error is well settled. [J]ury instructions must be read as a whole and . . . are not to be judged in artificial isolation from the overall charge. . . . The whole charge must be considered from the standpoint of its effect on the jurors in guiding them to a proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . The instruction must be adapted to the issues and may not mislead the jury but should reasonably guide it in reaching a verdict. . . .

We must review the charge as a whole to determine whether it was correct in law and sufficiently guided the jury on the issues presented at trial." (Internal quotation marks omitted.) *Opotzner* v. *Bass*, 63 Conn. App. 555, 558, 777 A.2d 718, cert. denied, 257 Conn. 910, 782 A.2d 134 (2001).

Specifically, the plaintiff asserts that the court improperly instructed the jury in three ways. First, he claims that the charge on proximate causation was misleading and inherently inconsistent. Although the plaintiff in his principal brief does quote a section of the charge that might have been confusing to the jury out of context, when that passage is read in the context of the whole charge, we conclude that the instruction was neither misleading nor inconsistent.[6]

[6] The relevant portion of the charge was as follows: "If in this instance you find that [the defendant] was negligent in that he concluded there was no evidence of peripheral vascular insufficiency and that [the plaintiff] for that reason could safely undergo foot surgery, and you further find that Dr. Schwartz performed the bunionectomy in reliance upon [the defendant's] report of December 15, 1995, and that the delayed healing or infection that [the plaintiff] experienced after surgery were within the scope of foreseeable risks created by the defendant's negligence, then you must find the defendant liable for those complications and for the associated losses and damages.

"In determining whether [the plaintiff's] postoperative complications were within the scope of foreseeable risk, you should consider whether it was foreseeable that in reliance upon [the defendant's] opinion that [the plaintiff] could safely undergo foot surgery, Dr. Schwartz chose to perform the bunionectomy and whether delayed healing and/or infection were reasonably foreseeable risks of that surgery.

"A doctor is not liable for a bad result if he uses reasonable care, skill and diligence. It is the absence of reasonable care, skill and diligence combined with that deviation proximately causing the injury that makes for liability and nothing else.

"Thus, if the inquiry or—excuse me—if the injury would have happened even though the defendant had not been negligent, then the defendant's negligence cannot be held to be a cause of the injury.

"If you conclude that the [plaintiff has not] proven the causal connection, that is, that the [plaintiff's] injuries were proximately caused by [the defendant's] failure to diagnose peripheral vascular insufficiency or that the [plaintiff's] injuries were wholly caused by some other factor exclusive of [the defendant's] negligence, if any, then you must return a verdict in favor of the doctor.

As to the specific discussion of proximate cause that the plaintiff claims is inconsistent, that appears to be a minor misstatement by the court, and one that did not affect the jury's overall comprehension of the charge.

The plaintiff seizes on the portion of the charge in which the court stated that "[i]f you conclude that the plaintiffs haven't proven the causal connection, that is, that the plaintiffs' injuries *were* proximately caused by [the defendant's] failure to diagnose . . . then you must return a verdict in favor of the doctor." (Emphasis added.) Read in context with the portions of the charge preceding and following that portion, it is apparent that the court meant "were not caused" rather than "were caused." Our interpretation is further supported by the content of the portions both preceding and following the portion at issue, which describe when the defendant may not be held liable. It is unlikely that the jury seized on the absence of a single word in a charge in excess of two pages in length to reach an improper verdict.

The plaintiff also claims that the instruction was improper because it did not address his allegation that the defendant had failed to perform accurate tests in assessing the plaintiff's condition. The plaintiff argues that the instruction was misleading because it directed the jury that it had to find that the plaintiff had a vascular insufficiency before it could find that the defendant was negligent. The plaintiff asserts that pursuant to the allegations in the complaint, the court should have instructed the jury that if it found that the defendant did not accurately conduct his assessment, whether the plaintiff actually had a vascular insufficiency, then it had to find that the defendant acted in a negligent man-

"Now, the defendant's conduct need not be the only cause, the sole proximate cause or the sole cause of the injuries suffered by the plaintiff in order to permit the plaintiff to recover, but to impose liability on the defendant, that failure on the doctor's part, if you find such a failure, must be a substantial factor in producing the result that occurred."

ner. The plaintiff then discusses the inaccurate ankle brachial index test that was performed by the defendant as the allegedly negligent conduct.

That argument does not acknowledge the standard of care issue, as we discussed at length in resolving the plaintiff's first claim on appeal. Before the jury could conclude that the defendant was negligent because of what he did or did not do, it first had to find that the performance of certain action or actions was mandated by the applicable standard of care. The court's instruction was not improper for its failure to address that point.

The plaintiff also argues that the instruction was improper because it did not address the possibility that the jury could find causation even if the plaintiff's complications were not caused by his vascular condition. That theory of liability was foreclosed when the court properly denied the plaintiff's motion to amend his complaint. We need not address that argument.

The judgment is affirmed.

In this opinion the other judges concurred.