KELLY GRONDIN, ADMINISTRATRIX (ESTATE OF ASHLEY M. GRONDIN), ET AL. *v.* JOSEPH F.J. CURI ET AL.
(SC 16769)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

---

Argued October 29, 2002—officially released March 18, 2003

*William R. Moller*, with whom was *Martha S. Gavenas*, for the appellants (plaintiffs).

*Augustus R. Southworth III*, with whom, on the brief, was *John R. Horvack, Jr.*, for the appellee (named defendant).

*Opinion*

NORCOTT, J. The sole issue in this appeal is whether the trial court properly concluded that an expert witness, testifying about the applicable standard of care in a medical malpractice action, must be board certified at the time of the alleged malpractice in order to qualify as a " 'similar health care provider' " under General Statutes § 52-184c (c) and (d).[1] The plaintiff, Kelly Gron-

[1] General Statutes § 52-184c provides: "(a) In any civil action to recover damages resulting from personal injury or wrongful death occurring on or after October 1, 1987, in which it is alleged that such injury or death resulted from the negligence of a health care provider, as defined in section 52-184b, the claimant shall have the burden of proving by the preponderance of the evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider. The prevailing professional standard of care for a given health care provider shall be that level of care, skill and treatment which, in light

din, individually and as administratrix of the estate of her daughter, Ashley M. Grondin (decedent), appeals[2] from the trial court's judgment of nonsuit for failure to establish a prima facie case in a medical malpractice action against the named defendant, Joseph F.J. Curi, a pediatrician.[3] We conclude that an expert need not

of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers.

"(b) If the defendant health care provider is not certified by the appropriate American board as being a specialist, is not trained and experienced in a medical specialty, or does not hold himself out as a specialist, a 'similar health care provider' is one who: (1) Is licensed by the appropriate regulatory agency of this state or another state requiring the same or greater qualifications; and (2) is trained and experienced in the same discipline or school of practice and such training and experience shall be as a result of the active involvement in the practice or teaching of medicine within the five-year period before the incident giving rise to the claim.

"(c) If the defendant health care provider is certified by the appropriate American board as a specialist, is trained and experienced in a medical specialty, or holds himself out as a specialist, a 'similar health care provider' is one who: (1) Is trained and experienced in the same specialty; and (2) is certified by the appropriate American board in the same specialty; provided if the defendant health care provider is providing treatment or diagnosis for a condition which is not within his specialty, a specialist trained in the treatment or diagnosis for that condition shall be considered a 'similar health care provider'.

"(d) Any health care provider may testify as an expert in any action if he: (1) Is a 'similar health care provider' pursuant to subsection (b) or (c) of this section; or (2) is not a similar health care provider pursuant to subsection (b) or (c) of this section but, to the satisfaction of the court, possesses sufficient training, experience and knowledge as a result of practice or teaching in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in a given field of medicine. Such training, experience or knowledge shall be as a result of the active involvement in the practice or teaching of medicine within the five-year period before the incident giving rise to the claim."

[2] The plaintiff appealed from the trial court's judgment to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

[3] Although Kelly Grondin brought this action in both her official and individual capacities, we refer to her herein as the plaintiff.

Carlton R. Palm, a specialist in allergy and immunology, was also named as a defendant in this action. He was the decedent's allergist and immunologist from April, 1993, through November, 1995. After a settlement was reached with him, the plaintiff withdrew her complaint against Palm. Accord-

be board certified at the time of the alleged malpractice in order to qualify as a " 'similar health care provider' " pursuant to § 52-184c (c) and (d), and that the trial court's preclusion of the plaintiff's expert witness on the standard of care, resulting in the judgment of nonsuit, was improper. Accordingly, we reverse the judgment of the trial court.

The record reveals the following facts and procedural history as undisputed and relevant to the disposition of this appeal. The decedent was born on April 7, 1984. The defendant, a board certified pediatrician, was her primary treating physician from 1984 until 1995. The decedent was plagued by respiratory problems throughout her life. In 1984, the defendant treated her for respiratory ailments including colds, choking and bronchitis. The defendant admitted the decedent to Charlotte Hungerford Hospital in September, 1987, with a diagnosis of " 'acute asthmatic bronchitis,' " and took a chest X ray of her at that time. She was admitted again to Charlotte Hungerford Hospital on January 10, 1989, with a diagnosis of " 'bronchopneumonia.' " A chest X ray was taken of her on January 10, 1989. In April, 1990, she was treated at Charlotte Hungerford Hospital for an upper respiratory infection. The decedent was relatively symptom-free in 1991, but she was seen by the defendant on April 29, 1992, for what the defendant described as " 'a lot of problems, including not wanting to go to school and trying to gag herself.' " She was treated again at Charlotte Hungerford Hospital on June 2, 1993, for respiratory symptoms, specifically lengthy intermittent coughing.

On November 16, 1995, the decedent was admitted to Charlotte Hungerford Hospital with complaints of persistent cough, fever and emesis of blood-tinged

---

ingly, he is not a party to this appeal. Hereafter, all references to the defendant in this opinion are to Curi.

mucous. A chest X ray was taken at that time. It was the first chest X ray taken of her since 1989. On November 17, 1995, a CAT scan indicated a large tumor in the decedent's lungs and, thereafter, she was transferred to the University of Connecticut Medical Center (UConn) for treatment. At UConn, an examination revealed that the tumor was in the third stage of cancer, which specifically was diagnosed as B-cell non-Hodgkin's lymphoma. She received chemotherapy for her cancer, but died on March 17, 1997.

The plaintiff initially brought this action against the defendant in October, 1997. In her complaint, she alleged that the defendant had breached the prevailing standard of care by failing to diagnose the decedent's lung cancer from June 2, 1993, through November 16, 1995, and by failing to monitor properly her respiratory problems by not ordering chest X rays between January 10, 1989, and November 16, 1995. The plaintiff also alleged that the defendant had failed to undertake an extensive differential diagnosis that was warranted by the decedent's respiratory signs and symptoms. She alleged further that the defendant should have realized that additional specialist consultations and referrals were warranted between June 3, 1993, and November 15, 1995. The plaintiff claimed that these alleged breaches of the standard of care deprived the decedent of the chance to have her cancer diagnosed and properly treated.[4]

During discovery, the plaintiff disclosed Marc J. Grella, a board certified[5] pediatrician who practices

---

[4] In her individual capacity, the plaintiff also alleged that she had incurred medical, hospital and funeral bills as a result of the defendant's alleged malpractice.

[5] We note that, during the preliminary examination at trial, Grella did not state explicitly that he was board certified at any time, including at the time of trial. He did, however, testify specifically about his training, medical society memberships, academic honors and academic journal article authorships. During argument to the trial court, plaintiff's counsel made multiple unchallenged representations that Grella was a board certified pediatrician

primarily in the Boston area, as an expert expected to testify at trial. The defendant deposed Grella on August 10, 2000.[6] Following the completion of discovery, the matter was tried to a jury before *Agati, J.*, commencing on September 11, 2001.[7]

The plaintiff called Grella as her first and only witness. Grella testified on direct examination that he is a physician with a specialty in general pediatrics, practicing at Massachusetts General Hospital in Boston. He attended New York Medical College, and graduated in 1993. After graduating from medical school, he completed a three year pediatric residency at the Children's National Medical Center in Washington, D.C. During his residency, he received training in general pediatrics and the associated subspecialties of, among others, cardiology, hematology, allergy and pulmonology. He completed his residency in June, 1996, and, thereafter, returned to Boston to practice. Grella testified that he is a member of the Massachusetts Chapter of the American Academy of Pediatrics, the Massachusetts Medical Society, the National Organization of the American

at the time of trial. The trial court either accepted those representations or inferred Grella's board certification, as of 1996, from his testimony. Accordingly, for purposes of this opinion, we will assume that Grella was board certified at the time of trial; indeed, as in the trial court, the key factual proposition governing the issue before us is that Grella was *not* board certified *at the time of the alleged malpractice.*

[6] The defendant contends that Grella was disclosed as an expert solely on the standard of care issue. We disagree with this assertion because our reading of the subject matter section of the plaintiff's disclosure notice, provided pursuant to Practice Book § 13-4 (4), is not that restrictive as that suggested by the defendant, particularly in light of the fact that, during Grella's deposition, the defendant had, and took advantage of, the opportunity to question him about his opinions, if any, on the progress and staging of the decedent's cancer. See *Barrows* v. *J.C. Penney Co.*, 58 Conn. App. 225, 232, 753 A.2d 404, cert. denied, 254 Conn. 925, 761 A.2d 751 (2000) ("[e]ven if we assume, arguendo, that the . . . disclosure did not comply with Practice Book § 13-4 [4], we do not find . . . prejudice").

[7] The trial court subsequently suspended the proceedings for one day because of the September 11, 2001 terrorist attacks.

Academy of Pediatrics and Alpha Omega Alpha, a general national medical academic honor society. He also testified that he has written several articles for medical academic journals. After presenting his credentials, Grella then testified that he was familiar with the general standard of care for the practice of pediatrics in the United States, and had formed an opinion as to whether the defendant deviated from that standard of care in the present case.[8]

Grella then testified about the information contained in the decedent's death certificate, and the treatments and diagnoses indicated in the defendant's notes regarding the decedent's office visits. He discussed the significance of the pneumonia discovered as a result of the decedent's January 10, 1989 chest X ray. The plaintiff's counsel then asked Grella: "[H]ow soon after January 10, 1989 would proper care require another chest x-ray?" Defense counsel objected to this line of questioning, contending that Grella was not competent to discuss the standard of care for a time when he was not a board certified physician.

Thereafter, outside the jury's presence, the plaintiff then conducted a preliminary examination into Grella's knowledge of the standard of care applicable in 1989. Grella described his knowledge of chest X rays, stating that he knew that the procedure's use predated his medical career, but, that he was not sure by how long. He stated that he had learned, however, while in his first year of medical school, that proper monitoring of a child with symptoms of respiratory distress requires the use of chest X rays.

Following the defendant's continued objections to the plaintiff's inquiry regarding the 1989 X rays, the

---

[8] Grella then testified that he had reviewed the decedent's laboratory reports and hospital records from both before and after her cancer diagnosis. He also testified that he had referred to two widely accepted pediatrics treatises in forming his opinion.

plaintiff turned the questioning to the 1993 X rays. The defendant objected again, maintaining that the timing change did not alter the basis of his prior objection to Grella's qualifications.

The jury then returned to the courtroom. Grella opined that any patient with pneumonia serious enough to require hospitalization should receive a follow-up X ray "to document its resolution." Grella then noted that his review of the decedent's records from January 10, 1989, to November, 1995, revealed no request by the defendant for a chest X ray during that time period. Grella also stated that he had reviewed the rest of the defendant's records for the decedent's medical history from the remainder of 1989 through June, 1993. Grella noted treatment for bronchitis and fever in June, 1993.[9]

Discussion then ensued among counsel and the trial court about the relationship between the applicable standards of care in 1993 and 2001. It was at this point that the objection to Grella's qualifications, based upon § 52-184c, resurfaced. The plaintiff's counsel then asked Grella whether he was aware of the standard of care for pediatricians in 1993, a line of questioning to which he gave inconclusive answers.[10] Following this

---

[9] Grella then noted his disagreement with and disbelief of the use of the term "bronchitis" as a diagnosis.

[10] To illustrate the lack of an actual answer to the question of whether Grella was familiar with the 1993 standard of care, we note the complete colloquy between Grella, counsel for both parties, and the trial court:

"[Plaintiff's Counsel]: Doctor, are you familiar with the recognized standard of care in the year 1993 for pediatricians in this country? . . .

"[Grella]: I was not a licensed physician in 1993.

"[Plaintiff's Counsel]: Were you familiar with the standards of care?

"[Defendant's Counsel]: Asked and answered. That's precisely the point. He was 23 years—

"The Court: Nothing further. . . .

"[Plaintiff's Counsel]: You became a physician in what year, sir?

"[Grella]: 1993.

"[Plaintiff's Counsel]: So you were a physician in 1993, correct?

"[Grella]: Yes, I was.

"[Plaintiff's Counsel]: And your field was pediatrics?

exchange, the plaintiff's counsel shifted the line of ques-

"[Grella]: Yes, it was.

"[Defendant's Counsel]: 1993? With all due respect, he testified he was in training.

"[Grella]: I was.

"[Defendant's Counsel]: Training program he didn't complete until 1996 after the events in question in this lawsuit. He may have chosen that to be his field. He was not a pediatrician. He will admit it.

"[Grella]: In 1993—

"[Defendant's Counsel]: Your Honor, there's no question pending.

"[Plaintiff's Counsel]: I asked if he was familiar, when he became a doctor in 1993. He said, yes. I asked him in the field of pediatrics, he said yes.

"The Court: That question was not asked.

"[Defendant's Counsel]: That question was not answered.

"The Court: That question was not asked.

"[Defendant's Counsel]: Your Honor, he already testified he was in training.

"The Court: Yes.

"[Plaintiff's Counsel]: He had chosen the field to be pediatrics. Correct?

"[Defendant's Counsel]: Irrelevant.

"[Plaintiff's Counsel]: It's relevant.

"The Court: I will allow him to answer the question.

"[Grella]: In 1993?

"[Plaintiff's Counsel]: The field of pediatrics.

"[Grella]: In 1993 I entered a pediatric residency program. I had received my medical degree. I was in the field of pediatrics. But one cannot become board certified until one completes the third year of pediatric residency. So it's not possible to be a board licensed pediatrician until you've completed your residency program.

"[Plaintiff's Counsel]: And, sir, in 1993, a child that was diagnosed with bronchitis, what was the standard of care in treatment?

"[Defendant's Counsel]: Objection to that on the grounds we stated earlier. I object to that.

"The Court: Sustained.

"[Plaintiff's Counsel]: Do you know what the standard of care for treatment of diagnosis of bronchitis was in 1993?

"[Defendant's Counsel]: Your Honor, you ruled on this. I objected earlier. You sustained the objection.

"The Court: Sustained.

"[Plaintiff's Counsel]: When were you aware—when did you become aware of what the standard of care for a pediatrician in the treatment of bronchitis [was], Doctor? . . .

"[Grella]: Okay, again, I do not believe in the diagnosis of bronchitis, so I don't have an opinion on that.

"[Plaintiff's Counsel]: So you don't recognize it?

"[Grella]: That's correct.

"[Plaintiff's Counsel]: It's not a question of standard of care, it's a question

tioning to the 1995 records. At this point, defense counsel renewed his objection to Grella's qualifications. The trial court then excused the jury and heard legal arguments on Grella's qualifications under § 52-184c to discuss the standard of care in 1995, and at any other point before he became board certified.

The trial court initially ruled that Grella was not a qualified pediatrician under the " 'similar health care provider provision' " of § 52-184c (b) because he had not practiced or taught for five years prior to the incident giving rise to the plaintiff's claim. Following additional testimony outside the presence of the jury, the trial court suspended the trial and granted the plaintiff permission to file an interlocutory appeal of its ruling. After a conference in chambers with counsel, the court granted the plaintiff's subsequent motion for reconsideration of its original ruling, noting that under subsection (c) of § 52-184c, which applies to specialists, no time restrictions are prescribed. The trial court then directed the parties to brief the issue of whether Grella was a " 'similar health care provider' " and return for argument the following day.

The following day, the defendant filed a motion in limine to preclude Grella from testifying about the standard of care. Following the submission of briefs and oral argument, the trial court ruled that § 52-184c (c) was the applicable subsection for a specialist expert

of bronchitis?

"[Grella]: Of the existence of the diagnosis as a pediatric disease.

"[Defendant's Counsel]: Your Honor, he's been—

"[Grella]: Sorry.

"[Defendant's Counsel]:—been told three times to limit his answers to the questions. He's answered."

Although he acknowledged that he was not board certified in 1993, nowhere in this discussion did Grella provide an explicit answer to the question of whether he knew what the standard of care was for pediatricians in 1993. The questioning then proceeded to the topic of the decedent's medical history in 1994–1995.

like Grella. The court noted the absence of applicable case law to clarify the issue of whether a specialist must be board certified at the time of the alleged malpractice, but it observed that the applicable standard of care under the statute was "the standard prevailing at the time of the treatment in question." Ultimately, the trial court ruled: "[F]or a similar health care provider to testify on the standard of care at the time of the treatment in question, that similar health care provider must have been board certified during the time period as indicated in subsection (c) of [§] 52-184c. [Grella] was not board certified at that time, therefore, on the issue of the motion to reconsider my ruling regarding the sustaining of the objection to [Grella's] testimony on the standard of care, the court reaffirms its previous ruling and sustains the objection."

The court then granted the defendant's motion in limine and precluded Grella from testifying. After the trial court granted the motion in limine, the plaintiff rested her case. The defendant subsequently moved for, and the court granted, a judgment of nonsuit pursuant to General Statutes § 52-210[11] due to the plaintiff's failure to establish a prima facie case.[12] This appeal

[11] General Statutes § 52-210 provides: "If, on the trial of any issue of fact in a civil action, the plaintiff has produced his evidence and rested his cause, the defendant may move for judgment as in case of nonsuit, and the court may grant such motion, if in its opinion the plaintiff has failed to make out a prima facie case."

[12] We note that "[a] motion for judgment of dismissal has replaced the former motion for nonsuit [pursuant to § 52-210] for failure to make out a prima facie case. . . . When such a motion has been granted, the question is whether sufficient facts were proved to make out a prima facie case. . . . The right of the court to grant such a motion is to be sparingly exercised . . . where the granting of a nonsuit must depend in any appreciable degree upon the court's passing upon the credibility of witnesses, the nonsuit should not be granted . . . where a case is close, the preferable course is to deny a motion for a nonsuit . . . . A prima facie case, in the sense in which that term is relevant to this case, is one sufficient to raise an issue to go to the trier of fact. . . . In order to establish a prima facie case, the proponent must submit evidence which, if credited, is sufficient to establish the fact or facts which it is adduced to prove. . . . In evaluating a motion to dismiss,

followed.[13]

I

The plaintiff claims on appeal that the trial court improperly construed subsections (c) and (d) of § 52-184c as requiring, in a medical malpractice action against a board certified physician, an expert witness to be board certified at the time the alleged malpractice occurred in order to qualify as a " 'similar health care provider.' " The defendant contends that the trial court's construction was proper because in light of the statutory scheme as a whole, as well as the practical necessity that an expert be aware of the standard of care prevailing at the time of the alleged malpractice, an expert must be board certified at that time. We agree with the plaintiff.

We first set out the applicable standard of review. "The trial court [generally] has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law." (Internal quotation marks omitted.) *State* v. *Reid*, 254 Conn. 540, 550, 757 A.2d 482 (2000). In the present case, however, the dispositive issue is the trial court's construction of a statute, namely, § 52-184c.

[t]he evidence offered by the plaintiff is to be taken as true and interpreted in the light most favorable to [the plaintiff], and every reasonable inference is to be drawn in [the plaintiff's] favor. . . . A party has the same right to submit a weak case as he has to submit a strong one." (Citations omitted; internal quotation marks omitted.) *Thomas* v. *West Haven*, 249 Conn. 385, 391–92, 734 A.2d 535 (1999), cert. denied, 528 U.S. 1187, 120 S. Ct. 1239, 146 L. Ed. 2d 99 (2000); see also *Winnick* v. *Nicoli*, 185 Conn. 195, 198, 440 A.2d 892 (1981) ("[t]he test seems to be that the motion should be granted if no jury of reasonable men and women, acting solely on the evidence, could render a verdict for the plaintiff" [internal quotation marks omitted]).

[13] A plaintiff may appeal directly from a trial court's judgment of nonsuit for failure to state a prima facie case. See General Statutes § 52-211; *Gryskiewicz* v. *Morgan*, 147 Conn. 260, 261, 159 A.2d 163 (1960).

"Statutory construction is a question of law and therefore our review is plenary." (Internal quotation marks omitted.) *In re Joshua S.*, 260 Conn. 182, 213, 796 A.2d 1141 (2002). Accordingly, we exercise plenary review over the trial court's ruling.

"The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Thus, this process requires us to consider all relevant sources of the meaning of the language at issue, without having to cross any threshold or thresholds of ambiguity. Thus, we do not follow the plain meaning rule.

"In performing this task, we begin with a searching examination of the language of the statute, because that is the most important factor to be considered. In doing so, we attempt to determine its range of plausible meanings and, if possible, narrow that range to those that appear most plausible. We do not, however, end with the language. We recognize, further, that the purpose or purposes of the legislation, and the context of the language, broadly understood, are directly relevant to the meaning of the language of the statute.

"This does not mean, however, that we will not, in a given case, follow what may be regarded as the plain meaning of the language, namely, the meaning that, when the language is considered without reference to

any extratextual sources of its meaning, appears to be *the* meaning and that appears to preclude any other likely meaning. In such a case, the more strongly the bare text supports such a meaning, the more persuasive the extratextual sources of meaning will have to be in order to yield a different meaning." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Courchesne*, 262 Conn. 537, 577–78, 816 A.2d 562 (2003).

Turning to the merits of this appeal, we begin by parsing the relevant language of § 52-184c as it applies in the context of a medical malpractice action.[14] Section 52-184c sets forth four distinct, yet closely intertwined, subsections.[15] Section 52-184c (a) requires the plaintiff to prove, by a preponderance of the evidence, that the defendant breached the "prevailing professional standard of care for that health care provider. . . ." That subsection then defines the "prevailing professional standard of care for a given health care provider [as] that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent *similar health care providers*." (Emphasis added.) General Statutes § 52-184c (a). For specialists, including physicians who are board certified like the defendant in this case, subsection (c) of § 52-184c defines " 'similar

[14] "[T]o prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury. . . . Generally, expert testimony is required to establish both the standard of care to which the defendant is held and the breach of that standard." (Internal quotation marks omitted.) *Marchell* v. *Whelchel*, 66 Conn. App. 574, 582, 785 A.2d 253 (2001).

[15] Our inquiry in this case is confined to subsections (a), (c) and (d) of § 52-184c because the defendant is a board certified physician. Subsection (b) of § 52-184c applies only to a "defendant health care provider [who] is *not* certified by the appropriate American board as being a specialist, is *not* trained and experienced in a medical specialty, or does *not* hold himself out as a specialist . . . ." (Emphasis added.)

health care provider' " as "one who: (1) Is trained and experienced in the same specialty; and (2) is certified by the appropriate American board in the same specialty . . . ."

Finally, subsection (d) of § 52-184c prescribes qualifications for expert witnesses in negligence actions against health care providers. Under that subsection, there are two ways for an expert to qualify to testify in an action against a specialist. The proposed expert may testify against a specialist if he or she is "a 'similar health care provider' pursuant to subsection . . . (c) . . . ." General Statutes § 52-184c (d). Alternatively, if the expert does not satisfy the requirements of subsection (c), he still may testify if he, "to the satisfaction of the court, possesses sufficient training, experience and knowledge as a result of practice or teaching in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in a given field of medicine. Such training, experience or knowledge shall be as a result of the active involvement in the practice or teaching of medicine within the five-year period before the incident giving rise to the claim." General Statutes § 52-184c (d). In the present case, it is undisputed that Grella had not taught or practiced medicine within five years before the claim of malpractice arose. To qualify as an expert in this case, he must, therefore, be a " 'similar health care provider' " under the board certification provision of subsection (c) of § 52-184c. Accordingly, we now turn to the question of whether subsection (c) of § 52-184c requires the expert to be board certified at the time of the alleged malpractice in order to qualify as a " 'similar health care provider.' "

In contrast to subsections (b) and (d) (2) of § 52-184c, subsection (c) is silent as to any element of time. It requires only board certification and training and experience in the same specialty. In determining the

import of this omission, we rely upon well established principles of statutory construction. "We construe a statute as a whole and read its subsections concurrently in order to reach a reasonable overall interpretation." *Board of Education* v. *State Board of Labor Relations*, 217 Conn. 110, 116, 584 A.2d 1172 (1991). Moreover, "a court must construe a statute as it finds it, without reference to whether it thinks the statute would have been or could be improved by the inclusion of other provisions." *Battersby* v. *Battersby*, 218 Conn. 467, 471, 590 A.2d 427 (1991). Inasmuch as the legislature prescribed explicit time constraints in the text of subsections (b) and (d) (2) of § 52-184c, but not subsection (c), our application of these principles leads us to conclude that the legislature did not intend for the testimony of a board certified expert physician to be subject to any time-based limitations.

We note that, although the legislative history is silent about the legislature's intent as to this specific issue, our construction of § 52-184c is consistent with the general purpose behind the statute's enactment. Section 52-184c was enacted by Public Acts 1986, No. 86-338, § 11, which is popularly known as Tort Reform I. It was not intended to alter dramatically the scope of what constitutes the standard of care in a medical malpractice case or who qualifies to testify about that standard.[16]

[16] At the time § 52-184c was enacted, this court had, because of the increasing national uniformity in physicians' "educational background and training," moved from the statewide standard of care, which was reaffirmed in *Fitzmaurice* v. *Flynn*, 167 Conn. 609, 617, 356 A.2d 887 (1975), to a national standard, free of geographic limitations. See *Logan* v. *Greenwich Hospital Assn.*, 191 Conn. 282, 301, 465 A.2d 294 (1983). The qualifying language of subsection (b) (1) of § 52-184c, applicable to nonspecialists, reflects this lack of geographic limitations. See General Statutes § 52-184c (b) (1) ("licensed by the appropriate regulatory agency of this state or another state requiring the same or greater qualifications"). Indeed, the nature of specialization lends itself to a national standard of care because "[t]he medical community in this country has, for the most part, standardized the requisite training and skill required of a specialist and requires board certification before one can legally hold himself out to be a specialist." 4 D. Louisell & H. Williams, Medical Malpractice (2002) § 29.02, p. 29-20.

According to Senator Richard Johnston, then chairman of the judiciary committee when the legislature enacted Public Act 86-338, § 52-184c "codif[ies] the standard of care as it has been developed through common law and [Connecticut] case law . . . ." 29 S. Proc., Pt. 10, 1986 Sess., pp. 3479–80 (explaining statutory phrase "in light of all relevant surrounding circumstances"). In explaining the bill, Representative William Wollenberg stated that "what they are trying to set out here is that the witnesses shall be of similar training in similar specialties and so on so that you have . . . witnesses who have . . . similar qualifications of that person who is accused." 29 H.R. Proc., Pt. 16, 1986 Sess., pp. 5739–40. Our review of the sparse legislative history leads us to conclude that the legislature did not intend § 52-184c to impose drastic changes on the existing standards of care or the process of qualifying experts in medical malpractice cases.[17] See footnotes 16 and 17 of this opinion.

[17] Indeed, the postenactment report of the law revision commission bears out our interpretation of legislative purpose:

"In large part, section 11 restates and codifies standards of care set under prior law. . . . The codified language contemplates a like standard . . . .

"The standard of care under the Act is different for specialists than for non-specialist. Specialist, those 'certified by the appropriate American board in the . . . specialty,' or who hold themselves out as specialists, section 11 (c) (2), are held to the standards of other like specialists. That distinction existed in the common law through reference to physicians 'in the same line of practice.' . . .

"Subsection (d) of section 11 carries over the definitions of 'similar health care provider' to the qualification of medical expert witnesses. To testify as an expert, the health care provider must qualify as a 'similar health care provider' under subsection (b) or (c), or, if he is not a similar health care provider, must satisfy the court under subsection (d) that he has sufficient training, practice, and knowledge including practice or teaching with the five-year period to qualify. . . . *As a practical matter, because subsection (d) gives the court discretion to qualify any knowledgeable person as an expert, it seems likely that the court will continue to qualify the same witnesses as experts under the Act as under prior law.* The underlying test, a demonstrated knowledge of the applicable standard based on 'sufficient training experience, experience, and knowledge,' is essentially the same under the Act as under prior law." (Citations omitted; emphasis added.)

We note that our conclusion is consistent with our sister states' approach to this issue. In the absence of a statute expressly requiring a physician to be certified at the time of the alleged malpractice, courts considering this issue uniformly have determined that an expert is not required to be board certified, or even to be a physician, at the time of the occurrence giving rise to the claim. See *Goodman* v. *Lipman*, 197 Ga. App. 631, 632, 399 S.E.2d 255 (1990) ("trial court erred in excluding [the proffered expert's] testimony based solely on the ground that he was not a physician at the time of the alleged malpractice"); *Summit Bank* v. *Panos*, 570 N.E.2d 960, 965 (Ind. App. 1991) (allowing physician to testify as expert as to 1983 standard of care for family practice, despite fact that she did not begin family practice residency until 1984, and was not board certified until 1987); *McGulpin* v. *Bessmer*, 241 Iowa 1119, 1131, 43 N.W.2d 121 (1950) (holding that where proffered expert otherwise was competent to testify, "[h]e should not have been held incompetent merely . . . because he was still a medical student [at the time of the alleged malpractice]"); *Tate* v. *Detroit Receiving Hospital*, 249 Mich. App. 212, 218, 642 N.W.2d 346 (2002) (stating that statutory requirement that expert must " 'specialize . . . at the time of the occurrence that is the basis for the action' in the same specialty as [the party against whom or on whose behalf the testimony is offered]" is consistent with statute's preclusion of testimony based " 'solely on the basis of the witness' lack of practice or teaching experience in the relevant specialty' "); see also *Durkee* v. *Oliver*, 714 P.2d 1330, 1332 (Colo. App. 1986) (stating that "[t]he extent of [the proffered expert's] knowledge of community standards, whether acquired during his short period of practice . . .

Report of the Law Revision Commission to the Judiciary Committee, Comparing Public Act 86-338, An Act Concerning Tort Reform and Prior Connecticut Law (1987) pp. 26–27.

[before the incident] or learned at a later time, would affect the weight rather than the admissibility of his testimony"); *Endorf* v. *Bohlender*, 26 Kan. App. 2d 855, 857, 995 P.2d 896 (2000) (discussing statutory requirement that expert witness devote " 'at least 50 [percent] of such person's professional time within the two-year period *preceding* the incident giving rise to the action . . . to actual clinical practice in the same profession in which the defendant is licensed' " [emphasis added]); cf. *Anderson* v. *Muniz*, 125 App. Div. 2d 281, 284, 508 N.Y.S.2d 567 (1986) (noting that former police officer could testify as expert in case involving allegations of police officer negligence; fact that he "had left the police department prior to the time the accident occurred affects only the weight, not the admissibility, of his testimony").

The defendant contends that, in order to testify properly as to the prevailing standard of care, "the expert must be . . . someone who was in a position to know the [proper] standard of care" and, therefore, it naturally follows, the defendant suggests, that a "proffered expert who was not board certified at the time of the alleged malpractice cannot reasonably be deemed a 'similar health care provider' to the defendant . . . who was so certified." The defendant also relies on our decision in *Fitzmaurice* v. *Flynn*, 167 Conn. 609, 617, 356 A.2d 887 (1975), as support for his claim that, before the enactment of § 52-184c, the "crucial question" was "whether the expert knows what the standards of practice are." Finally, to illustrate the "absurd[ity]" of the plaintiff's interpretation, the defendant poses the hypothetical situation of a board certified expert who was still in high school at the time an alleged act of malpractice occurred. We disagree with the defendant's contentions.

By its language, the statute does not require board certified experts to have gained their knowledge by any

particular method, such as from practice or experience, nor at any particular time. Moreover, the minimum standards set forth in § 52-184c have done nothing to abrogate the fundamental requirement, which was explicated in the "crucial question" of *Fitzmaurice,* that an expert testifying about the standard of care must know what that standard is in a particular situation.[18] *Fitzmaurice* v. *Flynn,* supra, 167 Conn. 617. Medical expert witnesses have long been permitted to acquire their knowledge of the applicable standard of care via study as well as by experience. See, e.g., *Pool* v. *Bell,* 209 Conn. 536, 542, 551 A.2d 1254 (1989); *Fitzmaurice* v. *Flynn,* supra, 618. We note that, under the defendant's proposed construction of § 52-184c, a hypothetical young physician who is, via study, and perhaps even a dissertation, the foremost expert in the development of a particular field of medicine, would be precluded from testifying. We deem that situation an absurd result, which we presume that the legislature did not intend; see, e.g., *Great Country Bank* v. *Pastore,* 241 Conn. 423, 432, 696 A.2d 1254 (1997); that a physician is not board certified at a particular time does not, per se, foreclose that physician from having acquired ample knowledge of the applicable standard of care at that juncture.

We also emphasize that the requirements under § 52-184c (d) do not affect the trial court's discretion to

---

[18] As this court stated in *Fitzmaurice* v. *Flynn,* supra, 167 Conn. 618: "Recognizing the complexity of knowledge required in the various medical specialties, more than a casual familiarity with the specialty of the defendant physician is required. The witness must demonstrate a knowledge acquired from experience or study of the standards of the specialty of the defendant physician sufficient to enable him to give an expert opinion as to the conformity of the defendant's conduct to those particular standards, and not to the standards of the witness' particular specialty if it differs from that of the defendant. It is the scope of the witness' knowledge and not the artificial classification by title that should govern the threshold question of admissibility."

determine whether a proffered expert is qualified to testify as an expert. See Conn. Code Evid. §§ 1-3 and 7-2; *Marshall* v. *Hartford Hospital*, 65 Conn. App. 738, 756–58, 783 A.2d 1085, cert. denied, 258 Conn. 938, 786 A.2d 425 (2001); *Rodriguez* v. *Petrilli*, 34 Conn. App. 871, 875–76, 644 A.2d 381 (1994); see also *State* v. *Reid*, supra, 254 Conn. 550. Indeed, § 52-184c merely sets out minimum qualification standards for experts in medical malpractice cases. Thus, a trial court that permits a physician to testify as an expert without first determining whether he or she has a sufficient basis for knowing the "prevailing" standard of care is abdicating its evidentiary gatekeeping responsibilities.[19]

We conclude that § 52-184c (d) does not, as a matter of law, preclude a board certified physician, otherwise knowledgeable as to the applicable standard of care, from testifying as an expert " 'similar health care provider,' " solely because the physician was not board certified at the time of the alleged malpractice.[20] We,

[19] This is illustrated by the following hypothetical. At trial, the plaintiff proffered, pursuant to § 52-184c, a board certified physician who held such certification at the time of the occurrence giving rise to the claim. If that physician testifies at trial that he or she is not familiar with or does not recall the standard of care applicable to the date in question, it certainly would be an abuse of discretion to allow that physician to submit expert standard of care testimony, despite that physician's having met the minimal statutory qualifications.

This hypothetical is not implausible. The proper standard of care in any given medical situation may be constantly evolving because of scientific developments. It is certainly possible that in order to testify accurately and competently about the standard of care applicable several years before the trial, an expert might need to supplement his or her own memory and knowledge with additional research. See, e.g., W. Tsushima & K. Nakano, Effective Medical Testifying: A Handbook for Physicians (1998) pp. 16–17, 26.

[20] We are obliged to emphasize that our decision in this case affects only the *admissibility* of an expert's testimony under § 52-184c. When experts' opinions conflict, as often happens in medical malpractice cases, "[i]t is the province of the jury to weigh the evidence and determine the credibility and the effect of testimony . . . . [T]he jury is free to accept or reject each expert's opinion in whole or in part." (Citation omitted; internal quotation marks omitted.) *Marchell* v. *Whelchel*, 66 Conn. App. 574, 583, 785 A.2d 253

therefore, conclude that the trial court's ruling to the contrary was improper.

## II

The defendant urges us to affirm the trial court's judgment on the alternate ground that the plaintiff offered no admissible evidence of causation. He claims that Grella was not disclosed as an expert on the subject of causation and that Grella stated at his deposition both that "he does not 'pretend to be an expert on lymphoma' " and that he has no opinions on the progress of the decedent's disease. The defendant also concedes, however, that Grella presented an offer of proof outside the presence of the jury on causation. We decline to address the merits of these contentions because the trial court record is insufficient to allow for adequate review of this alternate ground.

We note that the argument in the trial court centered on Grella's qualifications to testify as to the standard of care, and that the court's ruling granting the defendant's motion in limine never actually reached the issue of whether he was qualified on causation. "[W]e . . . may [only] affirm the court's judgment on a dispositive alternate ground for which there is support in the trial court record." (Internal quotation marks omitted.) *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, 259 Conn. 592, 599, 790 A.2d 1178 (2002). Furthermore, we view the issue of Grella's competence as a causation expert as necessarily tied to the § 52-184c issue considered in part I of this opinion.[21] " 'If the alternate issue was not ruled on by the trial court, the issue must be one that the trial court would have been forced to rule in favor of the

(2001). The *weight* of a proffered expert's testimony, therefore, remains a significant, but wholly separate, consideration in medical malpractice cases.

[21] We note that the minimum standards of § 52-184c only apply to the standard of care issue and not to causation. See *Wallace* v. *St. Francis Hospital & Medical Center*, 44 Conn. App. 257, 261 n.1, 688 A.2d 352 (1997).

appellee. Any other test would usurp the trial court's discretion.' W. Horton & S. Cormier, Connecticut Practice–Practice Book Annotated, Rules of Appellate Procedure (1994 Ed.) § 4013 (a) (1) p. 74, comment." *Metropolitan District Commission* v. *AFSCME, Council 4, Local 3713*, 35 Conn. App. 804, 805 n.1, 647 A.2d 755 (1994). In light of our conclusion in part I of this opinion, we "cannot conclude that the trial court would have been forced to rule in favor of the [defendant] on this claim." Id. We, therefore, decline to address the substantive merits of the defendant's alternate ground for affirmance.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.